Argued and submitted November 20, 1981, affirmed in part;
reversed in part and remanded June 9, 1982

STATE OF OREGON,
*Appellant - Cross-Respondent.*

*v.*

WILLIAM JAMES BURDICK,
*Respondent - Cross-Appellant.*

(No. 10-80-11729, CA A20791)

646 P2d 91

Frederick A. Hugi, Assistant District Attorney, Eugene, argued the cause for appellant - cross-respondent. With him on the briefs was J. Pat Horton, District Attorney, Eugene.

David E. Groom, Deputy Public Defender, Salem, argued the cause for respondent - cross-appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Before Buttler, Presiding Judge, and Warden and Warren, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

The state appeals from a pretrial order suppressing (1) all statements defendant made to police officers after they had deceived him during pre-arrest, custodial interrogation, and (2) as fruit of those statements to police, defendant's statements later that night to the booking officer and over the telephone to his relatives. Defendant cross-appeals the denial of his motion to suppress evidence obtained from a warrantless, consensual search, contending that his consent, given during interrogation and before his admissions, was the result of the same police deception and coercion that tainted his admissions and was, therefore, involuntary. The state concedes that the concept of voluntariness applies equally to confessions and consent searches, see *Schneckloth v. Bustamonte,* 412 US 218, 229, 93 S Ct 2041, 36 L Ed 2d 854 (1973), but argues that the trial court's rulings cannot be reconciled. We agree and affirm in part, reverse in part, and remand for trial.

Early in the morning of December 20, 1980, defendant left a rowdy party at which he had been drinking heavily. Another of the party-goers was shot and killed between 3 and 6:15 a.m. The death was reported about 9 a.m. Police investigated, learned who had been at the party, and contacted and interviewed defendant at his home late that morning. Early that afternoon, at the request of police, defendant voluntarily went to the police station for routine tests, including fingerprinting, gunpowder swabs, and photographs. He had had little sleep and apparently had been drinking again that day. About 7 p.m., police apparently learned that defendant had admitted to a friend, Paula Rawlings, between 6 and 6:30 a.m. that day that he had shot the victim and had attempted to shoot another person. At 8 p.m., police again contacted defendant, who agreed to accompany them to the police station. They arrived at 8:45 p.m. Defendant was advised of his *Miranda*[1] rights; he waived his rights to silence and to counsel and was interrogated for two hours.

The trial court found that, up to that time, defendant had voluntarily waived his *Miranda* rights, but that

---

[1] *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966).

during interrogation, police had employed several deceptive practices specifically designed to secure a confession[2]: falsely telling defendant that his wife had told police that he had admitted the homicide to her; accusing, in vulgar terms, defendant's wife of having had an affair with the victim; and falsely telling defendant that a woman had seen him near the homicide scene early that morning and that she would look at him in the interrogation room to identify him. When told of the "eyewitness," defendant said he did not object to having her "identify" him. The police brought in a woman who looked at defendant and said, "That's him"; in fact, that woman worked for the police department and had not seen defendant earlier. Defendant did not appear to react directly to those events.

At 10:50 p.m., within a few minutes after the false identification, another officer, who was unaware of the deceptive practices, sought and received defendant's oral and written consent to search his residence and vehicles. The police had been preparing a search warrant application but apparently did not pursue it after obtaining defendant's consent.

Sometime during the interrogation, although the record is not clear whether it was before or after the consent to search, the police discussed with defendant the various degrees of homicide with which he could be charged. The police admitted, and the trial court found, that they had never considered charging defendant with any crime less than murder and had extensively discussed the legal differences between murder and manslaughter to induce defendant to talk about the incident, *i.e.,* to incriminate himself.

At 11 p.m., police told defendant, apparently truthfully, that Rawlings had told them of defendant's admissions to her early that morning. The trial court assumed

---

[2] The police purposefully did not include these events in their reports, although the trial court noted that the officers appeared honest in answering specific questions at the hearing.

Defendant also alleged that he had been denied telephone access to call his wife and had told his interrogators that he did not want to continue talking. Defendant did not testify, and his interrogators either did not recall those events or denied them. The trial court made no specific findings on those allegations.

that information to be true, but found that it was used deceitfully with the earlier lies to pressure defendant to confess. Defendant still balked and asked why they did not charge him if they had the evidence. The sergeant responded by saying, "Fuck it. Book him for murder," and walked out of the room. Another officer repeated the substance of defendant's statements to Rawlings and asked defendant to say something to defend himself. Defendant asked for time to think and, within a minute, confessed.

During the next three hours, defendant met with his wife for a few minutes and then was taken to jail and "booked in." He was searched, fingerprinted and photographed. He made more incriminating statements, seemingly to justify the shooting. He was taken to post bond and then, at 2 a.m., was left in a waiting room where there was a telephone. Between 2 and 2:30 a.m. he telephoned relatives, the Broshears, and told them that he was in jail on a murder charge; there is evidence that he told them he had shot the victim and that he made other incriminating statements. The police learned of that call about three months later from someone who had spoken with the relatives shortly after the call.

The trial court found that the state had failed to establish by the clear weight of the evidence that the confession and subsequent admissions were not the product of police fraud, deceit and coercion; however, it found that defendant's consent to search was voluntary. Accordingly, it suppressed defendant's admissions, but not the physical evidence obtained from the search.

## ADMISSIONS

■ ■ The state has the burden of proving by the clear weight of the evidence that defendant's confession was made freely and voluntarily. *State v. Lloyd,* 22 Or App 254, 538 P2d 1278 (1975). The trial court ruled that the state had failed to meet that burden. Although the state contests some of the trial court's findings, as well as its conclusions, the record supports the findings of historical facts. We are bound by those findings, although we are not bound by the conclusion of involuntariness if we conclude that those historical facts do not support the trial court's conclusion under constitutional standards. *Ball v. Gladden,* 250 Or

485, 487-88, 443 P2d 621 (1968) (voluntariness of confession); *State v. Warner,* 284 Or 147, 157-58, 585 P2d 681 (1978) (voluntariness of consent to search).

■ ■ Voluntariness is determined by the totality of the circumstances; police trickery or false statements, alone, may not be sufficiently coercive to result in involuntariness. *Frazier v. Cupp,* 394 US 731, 739, 89 S Ct 1420, 22 L Ed 2d 684 (1969); *State v. Oakes,* 19 Or App 284, 527 P2d 418 (1974). The trial court here found that

> "'* * * for the police to commence a system of premeditated lies and falsehoods, mixing up at the end some truths with the avowed attempt of securing a confession from the defendant, that together with the other circumstances excluding *[sic]* the physical condition of the defendant as shown by the statements and the evidence of the police, the length of time the interrogation took place, * * * [made] the statements of the defendant to the police * * * not voluntary."

■ On the basis of the trial court's findings, we agree with its conclusion that the state had failed to prove that defendant's will was not overborne by the deceitful conduct of the police, rendering defendant's confession involuntary. Defendant was in custody when interrogated, *State v. Paz,* 31 Or App 851, 572 P2d 1036 (1977), *rev den* 282 Or 189 (1978), and had voluntarily waived his *Miranda* rights from the beginning of the interrogation. For several hours he maintained his innocence. It was only after lies, a staged false identification, implied suggestions that he might be charged with an offense less than murder if he cooperated but with murder if he did not, and vulgar insults, that he confessed. Given that background of deceptive and coercive tactics occurring over a period of more than two hours, the state has failed to establish by the clear weight of the evidence that it has met the

> "'* * * ultimate test * * * which has been the only clearly established test in Ango-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if *he has willed* to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Culombe v.*

*Connecticut,* 367 US 568, 602, 81 S Ct 1860, 6 L Ed 2d 1037 (1961), quoted in *Schneckloth v. Bustamonte,* 412 US 218, 226, 93 S Ct 2041, 36 L Ed 2d 854 (1973). (Emphasis supplied.)

■     Accordingly, the trial court properly suppressed defendant's initial confession. Once he had confessed, the cat was out of the bag. The state has not established that the taint of the involuntary confession and the coercive influence had dissipated before defendant's statements to the booking officer later that night during the booking process. Those statements, too, were properly suppressed.

As to defendant's telephone call to his relatives, however, the historical facts do not support the trial court's conclusion. Defendant argues that those statements were "fruit of the poisonous tree" and must be excluded under *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963). We reviewed the poisonous tree doctrine and exclusionary rule in *State v. Hacker,* 51 Or App 743, 627 P2d 11 (1981), involving a search. Although the doctrine and rule would exclude evidence obtained both directly and indirectly in violation of constitutional rights, *Wong Sun* requires more than a "but for" connection beween the violation and the challenged evidence. The Court in *Wong Sun* stated:

> "* * * We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959). * * *" 371 US at 487-88.

It is clear that the purpose of defendant's telephone call was to let his family know where he was and why; the triggering event was his arrest for murder. He had been told before he confessed that he was to be booked for murder. Had he been booked without confessing, he still would have had the occasion to make the call. It may be problematical whether he would have said as much as the state claims he did, but, given the fact that he had already

told Rawlings that he shot the victim, there does not appear to be any compelling reason why he would not. He was talking to relatives, not the police. Even if we accept defendant's contention that he would not have made his telephonic admissions "but for" having already confessed, that is not enough to exclude those admissions.

■ There is no evidence that the telephone call was an exploitation of the primary illegality. The police did not arrange the call; it was purely voluntary. Neither did they eavesdrop, wire-tap or plant an informer. They did not learn of the call until a witness volunteered the information to them several months later. As we stated in *State v. Hacker, supra,* 51 Or App at 750, 752:

> "* * * [Where] the likelihood that police officers foresaw the challenged evidence as a probable product of their illegal conduct is remote [,] * * * suppression of the evidence would not serve the purposes of the exclusionary rule. * * *
>
> "* * * * *
>
> "* * * The important considerations in determining whether there has been exploitation of the prior illegality are the purpose and flagrancy of any official misconduct. * * *"

Because there was an insufficient causal connection between the telephonic admissions to the Broshears and the inadmissible confession to the police, we reverse that part of the trial court's order suppressing the telephonic admissions.

## CONSENT TO SEARCH

■ As in the voluntariness of confessions, the state has the burden to establish the voluntariness of consent to search, *State v. Kennedy,* 290 Or 493, 502, 624 P2d 99 (1981), under the totality of the circumstances. *Schneckloth v. Bustamonte, supra,* 412 US at 226-27; *State v. Kennedy, supra.* However, "the burden on police to show voluntariness when consent occurs after illegal police conduct is greater than when no illegality has occurred." *State v. Kennedy, supra,* 290 Or at 502.

■ The court here found that defendant's consent, both oral and written, was voluntary, because it

"* * * would have been and was in full measure a corroboration of the story which he had uniformly given the police to that time, that he, in fact, did not kill the decedent. * * *"

That consent, however, cannot be divorced from the circumstances in which it was given. Defendant consented to the search only a few minutes before he confessed and after the police had been engaged for about two hours in deceptive conduct, which the trial court found was designed to, and did, overcome defendant's will. If we assume that defendant's will had not been overborne when he consented, it would be reasonable to assume also that he knew the police would find the murder weapon when they carried out the search. Unlike the defendant in *State v. Kennedy, supra,* defendant here did not volunteer the authorization to search; rather, his consent was given only after about two hours of police lies and deception and minutes before the only truthful incriminating statement reported by another to the police was relayed to defendant, following which he confessed. We have affirmed the trial court's conclusion that defendant's confession was involuntary, and we find it unrealistic to conclude that defendant's will was overborne by the improper police conduct at the time he confessed, but not at the time of his consent a few minutes earlier.

If the consent was voluntary, it would seem that, *a fortiori,* the confessions were voluntary. The only significant occurrences between defendant's consent and his confession were the true statement by the police to defendant that Rawlings had told them of defendant's admissions to her, followed by the interrogating officer's statement, "Book him for murder," when defendant refused to confess. The improper police deception and coercive and abusive conduct took place before defendant's consent, and we conclude that defendant's will was overborne by that conduct for the same reasons it was overborne with respect to his confession.

If there is a difference between the two events, the evidence derived from the search is trustworthy, whereas that obtained by defendant's statements may not be if, as the trial court found, his will was overborne. Although it is always distasteful to suppress otherwise trustworthy evidence, there are times when the lesser of evils is to do so.

To quote from *State v. Quinn,* 290 Or 383, 397, 623 P2d 630 (1981):

"'* * * We have held that the exclusionary rule of search and seizure should be applied only as broadly as is necessary to accomplish its protective and prophylactic purposes. *State v. Nettles,* 287 Or 131, 597 P2d 1243 (1979). *See State v. Scharf,* 288 Or 451, 461 n.10, 605 P2d 690 (1980). The device of excluding trustworthy evidence from the factfinding process in order to serve higher purposes 'is a needed, but grudgingly taken medicament; no more should be swallowed than is needed to combat the disease.' Amsterdam, Search, Seizure, and Section 2255, 112 U Pa L R 378, 389 (1964). * * *'"

The police conduct here was such that the medicament must be swallowed. As the court pointed out in *State v. Warner, supra,* it is the conduct that leads to the sanction which is the problem, because if the police perform their duties properly, there would be no illegally obtained evidence to exclude. 284 Or at 162-63.

It is no answer to say here that defendant's consent to the search was consistent with the innocence he had maintained during all that day and evening until subjected to two hours of custodial interrogation, trickery and verbal abuse. It was not consistent with his refusal to incriminate himself. If his will had not been overborne by that time, then it would be reasonable to infer that his confession was the result of his evaluating both the situation after he had been advised of the Rawlings statement to the police and the highly probable incriminating results that would follow the police search of his vehicle and home. In that case, his confession, too, would not be involuntary.

We conclude that the voluntariness of the consent and confession stand or fall together and that, given the improper conduct of the police, the state has not sustained its burden of proof. The telephonic admissions, however, are admissible, because they were not obtained by exploiting the illegality. Accordingly, we affirm that part of the order suppressing defendant's statements to police, reverse that part of the order suppressing the telephonic admissions to the Broshears, reverse the order denying defendant's motion to suppress evidence seized in the consent search, and remand for trial.