Argued and submitted June 25, 1984, reversed and remanded for new trial
March 6, 1985

# STATE OF OREGON,
*Respondent,*

*v.*

# BART OTTO COCHRAN,
*Appellant.*

(28160; CA A28994)

696 P2d 1114

Phillip M. Margolin, Portland, argued the cause and filed the brief for appellant.

Robert E. Barton, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

WARDEN, J.

## WARDEN, J.

■        Defendant appeals his conviction after jury trial for murder. ORS 163.115. The primary issue presented is whether the trial court erred in refusing to suppress some or all of the statements defendant made during a seven-hour police interrogation. Under *Schneckloth v. Bustamonte,* 412 US 218, 226, 93 S Ct 2041, 36 L Ed 2d 854 (1973), and *State v. Oakes,* 19 Or App 284, 291, 527 P2d 418 (1974), we consider "the totality of the circumstances" in determining whether defendant made the statements voluntarily. In doing so, we may consider only the facts found by the trial court, as supplemented by facts in the suppression hearing record that do not conflict with them. *See State v. Warner,* 284 Or 147, 585 P2d 681 (1978); *State v. Fields,* 51 Or App 125, 127, 624 P2d 655 (1980), *modifying* 49 Or App 1033, 621 P2d 651, *reversed on other grounds,* 291 Or 872, 636 P2d 376 (1981). We reverse and remand for a new trial.

The trial court's order denying defendant's motion to suppress expresses its findings of fact and conclusions of law in only six paragraphs, none of which deals with the murder itself. However, the facts leading up to defendant's interrogation were developed during testimony at the hearing and are important for understanding what happened in the interrogation.

On February 11, 1983, the evening before the murder, defendant became intoxicated in a bar in LaGrande.[1] The victim worked as a waitress in the bar but had little, if any, contact with defendant during the evening. Defendant sat for part of the evening with a woman, Patty Stroud, and two men, Cedric Page and David Trice. When another man flirted with Stroud, defendant called Stroud several abusive names, then grabbed her face and told her in coarse language that he would cut off her head. He turned to Page and said, "Tell her, Ced, what I do to bitches." Page escorted defendant out of the bar and then went home.

---

[1] Defendant is a 21-year-old male. At trial and on appeal his lawyers characterized him as extremely subnormal in intelligence, in part on the basis of an intelligence test administered approximately six weeks after the suppression hearing. The results of the intelligence test were not available to the trial court at the time of the suppression hearing, and defendant did not move for reconsideration when the results became available. We do not consider them in assessing the voluntariness of his statements.

At about 2:15 a.m., Stroud and her boyfriend, Brian, left the bar and went across the street to the Longbranch Tavern, where they saw defendant at the counter. After about 45 minutes Stroud and Brian left the Longbranch in Stroud's pickup. Some time later, defendant also left. Stroud's pickup broke down a few blocks from Candy Cane Park, where the murder took place. She and Brian briefly pushed the pickup toward the park, then left it and walked past the park to an apartment complex where Stroud's cousin lived. At the park they passed the victim, walking in the opposite direction.

Stroud was unable to rouse her cousin. She and Brian separated; he walked away from the park, and she went back toward the park and her pickup. As she walked past the park, she heard someone moaning and saw in the darkness a cream-colored shape near the middle of the park. The shape appeared to be one person on top of another. She thought that she was witnessing sexual intercourse and hurried by. She recalls the time as being around 4 a.m. and no later than 4:45 a.m.

At 4:15 a.m. defendant returned to the Longbranch. The cook served him coffee and noticed that his knuckles were scraped and that his hands looked as if they had recently been scrubbed. The cook noticed no blood on defendant.

At about 7 a.m. two men discovered the victim in the park. There was a pool of blood near the sidewalk where Stroud and Brian had passed the victim. A trail of blood led from the pool near the sidewalk to the place where the victim was found, near the middle of the park.

When defendant reported for work at about 3 p.m. on Saturday, February 12, it was widely known that a murder had taken place in Candy Cane Park the previous night. Defendant participated in the speculations about the victim's identity. He said that he had heard that the victim worked at the bar where he and his friends had been the previous evening. Few people knew the victim's identity at that time; the police did not disclose her identity to the public until Monday.

At approximately 7:15 p.m. on the Monday following the Saturday morning murder, Lieutenant O'Rourke and another LaGrande police officer went to defendant's home and told him that they were investigating the murder. Defendant allowed them to search his house and his pickup. They

found nothing incriminating. Defendant also agreed to accompany the officers to the police station to answer some questions. They told defendant that he was not under arrest and that they would not order him to come. Defendant testified that he understood and that he went voluntarily to the police station in the officers' car. The trial court found that "[w]hen the defendant was requested to come to the police department to be interviewed, it was merely as a witness and not as a suspect."

O'Rourke and Sergeant Button interrogated defendant at the police station for approximately seven hours, from 7:45 p.m. until 2:40 a.m. At first defendant denied the altercation with Stroud in the bar, but he eventually admitted grabbing her by the throat and threatening to chop off her head. He told the officers that he thought he had seen Stroud leave the Longbranch and that he left shortly thereafter but that he had not crossed Adams, a major street between the Longbranch and the park. When O'Rourke reminded defendant of the distinct appearance of his pickup, defendant admitted that he had indeed crossed Adams and had driven down the street that leads from the Longbranch to the park. Defendant said that he had seen an older model pickup break down and a man and woman get out of the truck and walk down the street in the direction of the park. He stated that he could not remember whether his pickup lights had been on at the time. He said that he had followed the couple a short distance before passing them on his way to Page's apartment. He explained that he wanted to apologize to Page for his behavior earlier in the evening but did not find him at home. Defendant said that as he drove back by the park, he saw a person walking on the sidewalk in the dark area between the street lights at either end of the park. He said the time was about 4:10 or 4:15 a.m.

At about that time in the interrogation Button left the room to tell Police Chief Johnson about the turn the interrogation had taken. Johnson told him to advise defendant of his *Miranda* rights. Button re-entered the room as O'Rourke continued to question defendant and passed O'Rourke a note telling him to read defendant his rights. O'Rourke admitted at the suppression hearing that he resisted the instructions because

"I had not advised anyone else I had interviewed in this particular situation and I did not want to advise Mr. Cochran. I thought maybe if I advised him of his rights and he had information pertaining to the murder, he wouldn't give it.

"Q   And he'd ask for a lawyer?

"A   Yes, sir."

O'Rourke left the room to try to change Johnson's mind. In his absence, defendant tried to get Button to tell him whether Button thought defendant had killed the woman. Button assured defendant that he did not think so, but proceeded to read defendant his *Miranda* rights.[2] Button had defendant sign a card acknowledging defendant's understanding of his rights and then, in response to defendant's repeated questions about whether Button suspected him, threw the rights card in the wastebasket. He testified:

"At that point, he again asked me, 'You don't think I killed her, do you?' I said, 'Bart, if I thought you'd killed her, I wouldn't do this.' At that point, I took the *Miranda* card and placed it in the trash can on the opposite side of the desk."

O'Rourke reentered the room carrying a color photograph of the victim's face. Button told him that defendant had been advised of his rights. O'Rourke sat on the desk in front of defendant and held the photograph directly in front of defendant's face. He asked defendant three times, "Did you do this?" Defendant denied it the first time, and the second time turned to Button and said, "I couldn't have done that, could I?" The third time he refused to answer.

---

[2] Defendant's description of the events suggests that Button read the rights in an oddly equivocal fashion, apparently to minimize the chance that defendant would request an attorney:

"He goes down through it and he goes, 'If I thought you did it, I'd read you this one,' and then he reads #1 and then he goes, 'If I thought you did it, anything you say,' and then he just said that every time. And, then he said, 'And, then I'd sign it right here.' * * * He signed it first and then, 'If I thought you did it, I'd have you sign it right there.' I go, 'I don't want to sign that. I didn't do it.' And he goes, 'Go ahead. Go ahead.' And then I * * * signed it and then he goes, 'But, I don't think you did it.' "

The trial court either disbelieved defendant or considered Button's behavior immaterial. Its order denying defendant's motion to suppress states only:

"Officer Button properly advised the defendant of each of his *Miranda* rights. The defendant heard and understood these rights. * * * The defendant also knowingly, intelligently and voluntarily waived those rights."

O'Rourke left the room and returned with a black light. He directed defendant to put his hands under the light for the purpose, according to his testimony at the suppression hearing, of "jar[ring] the defendant into telling the truth, making him have an impression that something is happening that maybe isn't." When the light caused defendant's hands to glow a flourescent orange color, O'Rourke told him that blood on his hands produced the glow. That apparently had an unnerving effect on defendant. He claimed that the blood must have been his own. According to Button:

> "[Defendant] was looking at his hands and rubbing them together as if he was trying to get something off of them. He was asked if that was blood on his hands and if it was Dana's blood and he said something to the effect, 'It couldn't be her blood, could it?' and, directed further questions like, you know, 'It couldn't be hers.' And then from that point, he just kept rubbing his hands together trying to get something off of them."[3]

Defendant then requested that O'Rourke leave the room. "If you'll just stop saying I killed her, I'll talk to Sergeant Button." O'Rourke left, and for the rest of the night Button conducted the interrogation.

Button said, "Sit down, Bart. Talk to me. Let's figure this out, the two of us. You know, I help you, you help me." Soon thereafter, Button began using an interview technique that he invented. He told defendant to relax, lean back, close his eyes, imagine that he was watching a motion picture screen and concentrate on Button's questions. He told defendant that by so doing he and Button would be able to retrieve information from defendant's subconscious mind. (Button had had no training in the use of hypnotic induction as an interrogation technique.) He seems to have used the technique initially to help defendant remember things that defendant said he had observed on the night of the murder. As the

---

[3] Button's account of the incident at trial differed from his testimony at the suppression hearing. At trial he did not state that defendant had responded in a doubtful or questioning tone:

"And, he said, 'No, it couldn't be,' and he started rubbing his hands like this. And, he said, 'What is that on your hands'' Is that blood on your hands?' He goes—he made some comment but he kept rubbing his hands together like he was trying to wipe them off."

interrogation progressed, however, Button convinced defendant that defendant had a special "gift" and that defendant could use it to tell Button about things that defendant did not claim to have personally observed.

At 10 p.m., approximately 30 minutes after O'Rourke left the room, the Director of Mental Health Services for Union County, David Still, entered the room. He remained there for the rest of the interrogation. At 11 p.m. Button put a microphone on the desk in front of defendant, and officers in the next room began taping the interrogation. They taped intermittently for the remainder of the night; portions of the interrogation after 11 p.m. were not taped. The following examples from the transcript of the taped portions illustrate the manner in which Button conducted the interrogation, and they also set out the part of the interrogation most important to the state's case.

"Button: Pulled her back one more time. At that point this unknown person killed her. He hit her with something. It had to be something. It had to be at that point right there where he hit her the first time with something. You've described her coat, her hair, you, this time, when ... you to go back. I want you to look for that something. I want to know what to go out there and look for. I want to find it. Tell me what this object is when you get to that point, where he pulls her back the last time and she's still trying to get away. Look for that something. It's probably, you right handed. I'm right handed, he's left handed. Look at his right hand, the odds are he's gonna be right handed. Look at his right hand.

"Cochran: (inaudible) This is just too good to be sayin'.

"Still: Go ahead man, that's unknown.

"Cochran: (inaudible) I can't picture what it was though (inaudible) Just hit her (inaudible).

"Button: Go back and freeze the frame just like a movie projector. Go to where they were hasseling there and he had his hand in the air. At that point see what he's got in his hand. It will come down, either hit her on the top of her head or on the right side of the head. He was right handed. Tell me what was in his hand.

"Cochran: (inaudible)

"Button: Take a look at that right hand, watch it come down and tell me what was in his hand."

There is a long pause in the conversation.

"Button: Do you see the right hand? Do you see it? Freeze it, tell me what it is.

"Cochran: It's shiny.

"Button: Huh?

"Cochran: It's metal shiny.

"Button: Like a...like what?

"Cochran: It's shiny like my knife blade.

"Button: It's shiny like your knife blade?

"Cochran: Yeah, it's that shiny. I see the reflection easy.

"Button: Would you say it's the same size. It's probably a pretty good size for you to see it there.

"Cochran: Yeah, it was.

"Button: Take a look at that. Tell me if it's possible that this guy had a knife just like yours. Just freeze that frame and see that knife. Take your time. You're doing great. Just take your time and look at the hand and see it up in the air. You'll see something shiny in the hand. Now focus in on that and think. Do you see the knife? Tell me what it is.

"Cochran: It's more like a hatchet.

"* * * * *

"Button: About how long was it from handle to tip? How many inches? (inaudible) (Shows a ruler) About that size or longer?

"Cochran: I can't see the blade but it seems like it's more of a hatchet style. (inaudible)

"Button: Close your eyes and do that. Close your eyes _____up here with the ruler in your hand. (ruler in hand Bart simulated a hacking motion) Come down like the guy did with the hatchet and tell me what you see. Just act it out for me.

"Cochran: (inaudible) Damn I was past _____ (inaudible)

"Button: Ok, your subconscious has got this.

"Cochran: (inaudible)

"Button: Okay, where did the first blow go? You got it .....

"Cochran: Top of the head (he gestures chopping motion).

"Button: The very top of the head. Okay.

"Still: Was she facing him or was she turning?

"Cochran: (inaudible) never did see them fall (inaudible)

"Button: I believe you. Man this is strictly out of your subconscious. When you get done here I'll show you a trick about that hatchet you're holding in your hand there, that ruler. Let me show you something about this ruler. To your subconscious this is a hatchet. You just replaced this ruler for the hatchet. Right. You and I know it's a ruler but to your subconscious when you hold this in your hand, that becomes the hatchet that hit that girl right? Now let me show you a little thing that you can do with this. Only a very few people can do this and you're one of them because you've demonstrated that. I want you to hold onto this hatchet, close your eyes and tell me where it's at right now.

"Cochran: (inaudible)

"Button: I want you to tell me where I can go—where I can walk out of this room and find that hatchet. It's called transfer — it's called projection transfer. That's what that's called. You're transferring this ruler to that hatchet, and you'll be able to tell me where that guy threw that hatchet or hid it. Even though you've never seen it, and you don't know where it's at, you'll be able to tell me where I can find it. Will you try that? Okay, do that. Grab a hold of that hatchet and close your eyes and tell me what he did with that hatchet. You'll be able to see that hatchet laying someplace.

"Cochran: It seems like thick bushes."

Defendant eventually said that he thought the hatchet was in thick bushes behind Homer Lefell's house, across the street from the park. Defendant later told Button several times that he "can't see how this is working" and that his statements on the hatchet and matters other than the two people on the sidewalk were "just guessing." Button later began to question defendant about another murder:

"Button: Bless your pointed little head my man, that's great Bart. You're doing fine. There's very few people that have the gift that you got. You don't realize the gift that you have here. This is amazing. Let me throw something at you here. Just your feelings inside. 'Cause you can see this. We're plain folk. We can't see this. This guy has obviously just killed this girl, right? So, there's an old adage in police work that if he's done it once possibly he done it again. And you came up with a very key word there. You flashed onto Morgan. There's a distinct possibility that this guy may, just from what you've seen, you may be able to flash into Morgan Lake. You

remember the one that made the press here awhile back. The Sylvia Heistuman deal . . ."[4]

Using the same technique, Button elicited from defendant a description of the Heistuman murder—a murder he could not have committed because, as the state concedes, he was in California at the time.

At 12:30 a.m., defendant asked Button, "Do you think I need a lawyer?" Button replied, "I don't know," and for a while neither he nor defendant said anything. At 2 a.m., as Button continued to question defendant about the Heistuman murder, defendant requested that Button call his attorney.[5]

Defendant's lawyer did not answer. The Union

---

[4] Sylvia Heistuman was murdered several months before the victim in this case.

[5] Although the trial court found otherwise, the record strongly suggests that there was an earlier request for an attorney. The transcript respecting defendant's attorney request reads:

"Button: Uh huh. Okay, and you said he put her [Heistuman] in the stream to wash her off. Is it getting tough? Let's back up.

"Cochran: You get ahold of my lawyer?

"Button: Did I get ahold of your lawyer? You want me to try and get ahold of him for you again?

"Cochran: Yeah, let's try that.

"Button: Okay, let me find the phone book, what they do with the phone book. Oh, here it is. I'm trying to get ahold of his lawyer.

"Cochran: Will I be able to go to work tomorrow or will I have to ask.

"Button: I'll have to ask Mr. Mammen, he's in the other office. He's out there doing whatever D.A.'s do. You know how they are.

"Still: A couple of questions, you're checking on the lawyer's name?

"Button: Well, let me get ahold of his lawyer.

"Still: Okay.

"Cochran: You're gonna call him at two?

"Button: We can call him anytime you want.

"Cochran: Okay.

"Still: You gonna call him now, or you want ta.....

"Button: Yeah, I got him right now.

"Cochran: Will I need him or.....

"Button: Huh?

County District Attorney, who had been monitoring the interrogation in the next room, instructed Button to continue questioning defendant despite his request for an attorney. Button continued the interrogation for another 40 minutes. Defendant was then jailed.

The next day, the LaGrande police conducted an intensive search of the area behind Lefell's house, where defendant had said the hatchet might be found. Volunteers crawled in a straight line, shoulder to shoulder, across the area and over a weedy grass pile behind the house and found nothing. The news media broadcast that police were searching for a small, chrome-plated hatchet in the area. At some point, the police began tearing shrubs out of the ground around Lefell's house. Although no one who testified at trial knew whether a metal detector had been used to search the grass pile specifically, there was evidence that the police had used metal detectors in their search of the area around Lefell's house.

Three months later, more than a month after the suppression hearing, a boy mowing part of Lefell's yard near the grass pile noticed the handle of a hatchet sticking out of the grass pile. Analysis of the hatchet in the FBI crime laboratory detected no fingerprints or blood on it, but the state crime laboratory concluded, on the basis of matching striations on the blade and on the victim's skull and on the basis of particles of hair closely resembling the victim's found adhering to the blade, that it was indeed the murder weapon.

---

"Cochran: Will I need him?

"Button: I don't know, do you want me to call him?

"Cochran: Well, do you think I'll need him for this case. Let's call him up. I better get some information just for the record.

"Button: Sure."

The trial court apparently accepted the explanation Button gave of why he said, "Did I get ahold of your lawyer? You want me to get ahold of him for you again?":

"Okay. I was trying to clarify with Bart if he wanted me to get ahold of his attorney at this time. The last time he asked me, he never asked for one. He asked me, 'Do you think I need an attorney?' I stated, 'I don't know, Bart. It's up to you. If you want one, just ask and we'll get you one.' No response from defendant. The second time I was clarifying once again, 'Do you want an attorney this time or not?'"

On appeal, defendant does not question the trial court's acceptance of this explanation.

At trial, the state based its case on the theory that defendant had meant to kill Stroud but had killed the victim by mistake, because of the darkness, the similarity between the victim's clothing and Stroud's and defendant's intoxication. The state argued that defendant betrayed his guilt by telling Button things he could not have known if he were innocent: *e.g.*, that the murder weapon would be found behind Lefell's house and that the victim had been hit in the back. The trial court allowed the jury to hear all of defendant's statements during the seven-hour interrogation except those made in the last 40 minutes, after defendant's 2 a.m. request for an attorney. The state also introduced testimony concerning inconsistent statements that defendant made after the interrogation to investigators and to a fellow inmate. Over defendant's objection, the court allowed the officer who pulled the murder weapon out of the grass pile to testify that it appeared to have been there a long time.

The jury found defendant guilty as charged, and the court sentenced him to life imprisonment. The court ordered that defendant not be considered for parole before serving ten years of the sentence.[6]

Defendant argues that the trial court erred in denying his motion to suppress statements that he made during the interrogation, because his statements and his failure to request an attorney until 2 a.m. were the product of trickery, coercion and deceit on the part of O'Rourke and Button and because defendant's statements while he was using his "projection transfer" powers were intended to be the product of defendant's imagination, not the truth.

■ ■ Defendant does not expressly identify either the United States or the Oregon Constitution as the source of the rights he claims were violated. His brief, however, relies entirely upon federal cases, or upon Oregon cases that appear to have been decided under the federal constitution, in its discussion of all issues related to the voluntariness of defendant's actions.[7] Although we are mindful of the rule that "all

---

[6] The state agrees that under *State v. Macy,* 295 Or 738, 671 P2d 92 (1983), decided after the trial and sentencing in this case, the trial court erred in imposing a ten-year minimum sentence under ORS 144.110(1) for the crime of murder. ORS 163.115.

[7] For the reasons expressed in *State v. Flores,* 68 Or App 617, 685 P2d 999 (1984),

questions of state law be considered and disposed of before reaching a claim that this state's law falls short of a standard imposed by the federal constitution on all states," *State v. Kennedy, supra,* n 7, we decide the case under the federal constitution, because defendant seems only to have made federal claims.

■■■ The fundamental test of admissibility is whether defendant's actions were voluntary. *Schneckloth v. Bustamonte, supra.* It is the state's burden to prove that defendant's actions were voluntary by the clear weight of evidence. *State v. Burdick,* 57 Or App 601, 646 P2d 91 (1983). No single test of voluntariness is determinative; a court must consider "the totality of the circumstances." *Schneckloth v. Bustamonte, supra; Frazier v. Cupp,* 394 US 731, 739, 89 S Ct 1420, 22 L Ed 2d 684 (1969). However, police deception weighs against a finding of voluntariness. *See Massiah v. United States,* 377 US 201, 84 S Ct 1199, 12 L Ed 2d 246 (1964); *Spano v. New York,* 360 US 315, 79 S Ct 1202, 3 L Ed 2nd 1265 (1959); *Leyra v. Denno,* 347 US 556, 74 S Ct 716, 98 L Ed 948 (1954). The "totality of the circumstances" in this case makes clear that the state did not sustain its burden. O'Rourke and Button did four things to defendant that combined to overbear defendant's will and render his incriminating statements involuntary.

■ First, Button's unorthodox interrogation techniques, combined with his statement, "Bart, if I thought you'd killed her, I wouldn't do this," and his then throwing the rights card in the wastebasket, frustrated an important purpose of the *Miranda* rule: "to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest." *Miranda v. Arizona,* 384 US 436, 469, 86 S Ct 1602, 16 L Ed 2d

---

it is difficult to determine which constitution was being construed in many of the Oregon cases that defendant cites in discussing constitutional issues. All but one of the cases, however, rely primarily on federal case law, suggesting that federal constitutional issues were at stake. The exception is *State v. Ely,* 237 Or 239, 390 P2d 348 (1964), which defendant cites along with *Columbe v. Connecticut,* 367 US 568, 602, 81 S Ct 1860, 6 L Ed 2d 1037 (1961), for the proposition that the state must show that confessions and admissions were voluntarily made. *Ely* suggests that the relevant state and federal standards are identical, but does not rely on federal authority. If the citation raises an Oregon constitutional issue, we conclude that it is in the category of "mere unexplained citation of an Oregon source tacked on as an 'afterthought' * * *." *State v. Kennedy,* 295 Or 260, 268, 666 P2d 1316 (1983).

694 (1966). We do not accept defendant's argument that Button "withdrew" the *Miranda* warning when he threw the card in the wastebasket. Although Button was not required to give the *Miranda* warning until defendant reasonably could have felt himself unfree to leave, the warning nevertheless informed defendant of his rights. The state correctly argues that "the officer's unconventional act did not confuse defendant or lead him into a belief that he could not, at any time, invoke his constitutional rights." Button's acts did, however, lead defendant to believe that he was "helping them capture a guy" and that he was not the focus of the investigation himself. Button's acts, therefore, led defendant to underestimate the importance of the conversation, and of having an attorney present. According to White, "Police Trickery In Inducing Confessions," 127 U of Pa L Rev, 581, 602, 603-4 (1979):

> "A form of deception that totally undermines the fifth or sixth amendment protections available to an individual occurs when the police deceive a suspect about whether an interrogation is taking place.
>
> "* * * * *
>
> "* * * When a suspect is deceived about whether the government is seeking to elicit incriminating evidence from him, he obviously has little basis upon which to assess or reassess the question whether he needs the assistance of counsel during this phase of the adversary process. Therefore, even if the suspect has initially waived his right to an attorney, police deception about whether an interrogation is currently taking place should also be impermissible per se." (Footnotes omitted.)

Second, O'Rourke and Button used the "good-guy bad-guy" routine to make defendant depend on Button.[8] The

---

[8] Although their use of the "good-guy bad-guy" routine is clear from the record, O'Rourke and Button did not specifically admit at the supression hearing to having deliberately used that technique. During O'Rourke's cross-examination at the suppression hearing, defendant's attorney asked:

"Q: Isn't it a technique in questioning that often times police officers, one will act like the good guy and one will act like the bad guy?

"A: Yes, sir.

"Q: Did you do that in this case with you and Button, one of you telling Mr.

dependency made it unlikely that defendant would decide against cooperating with Button. It also made it unlikely that he would decide for himself whether to request an attorney, as is clear from his questions to Button about whether he needed an attorney. In *Miranda v. Arizona, supra,* the United States Supreme Court discussed several interrogation techniques, including the "good-guy bad-guy" routine, commonly used at that time to "persuade, trick, or cajole [a subject] out of exercising his constitutional rights." 384 US at 455. Quoting in part from a standard manual of police interrogation, the Court said:

> "One ploy often used has been termed the 'friendly-unfriendly' or the 'Mutt and Jeff' act:

> " '* * * In this technique, two agents are employed. Mutt, the relentless investigator, who knows the subject is guilty and is not going to waste any time. He's sent a dozen men away for this crime and he's going to send the subject away for the full term. Jeff, on the other hand, is obviously a kind hearted man. He has a family himself. He has a brother who was involved in a little scrape like this. He disapproves of Mutt and his tactics and will arrange to get him off the case if the subject will cooperate. He can't hold Mutt off for very long. The subject would be wise to make a quick decision. The technique is applied by having both investigators present while Mutt acts out his role. Jeff may stand by quietly and demur at some of Mutt's tactics. When Jeff makes his plea for cooperation, Mutt is not present in the room.' " 384 US at 452.

*See People v. Freeman,* 668 P2d 1371 (Colo 1983).

---

Cochran that—that you were going to tear him apart if he didn't confess?

"A: That was not said, no."

At trial, however, O'Rourke was asked:

"Q: * * * Were you and Button playing good guy bad guy?

"A: That was a technique that was used, yes."

Defendant's lawyer during the suppression hearing did not pursue the question further with O'Rourke and did not specifically identify the use of the good-guy bad-guy routine as an impermissible part of the interrogation; instead, he made only a general argument about the "subtle and coercive" pressure that the officers had used. Although there may be room for doubt about whether the issue was adequately preserved for review, *State v. Hickman,* 273 Or 358, 360, 540 P2d 1406 (1975), requires only that an appeal "be heard on the same theory upon which it was presented in the court below." Defendant has not departed from the essential theory relied upon in the suppression hearing by raising the permissibility of the good-guy bad-guy routine at trial and on appeal.

Third, O'Rourke and Button lied to defendant about why his hands glowed orange under the black light. In *State v. Burdick, supra,* we affirmed the trial court's conclusion that the state had failed to prove that the deceitful conduct of the police had not overborne the defendant's will. The defendant in *Burdick* voluntarily waived his *Miranda* rights, but the police

> "employed several deceptive practices specifically designed to secure a confession: falsely telling defendant that his wife had told police that he had admitted the homicide to her; accusing, in vulgar terms, defendant's wife of having had an affair with the victim; and falsely telling defendant that a woman had seen him near the homicide scene early that morning and that she would look at him in the interrogation room to identify him. When told of the 'eyewitness,' defendant said he did not object to having her 'identify' him. The police brought in a woman who looked at defendant and said, 'That's him;' in fact, that woman worked for the police department and had not seen defendant earlier." 57 Or App at 604.

The black light trick used in this case was no less deceptive and no less likely to produce involuntary incriminating behavior.[9]

Finally, Button took advantage of defendant's dependency and tricked him into believing that defendant had supernatural abilities that Button could use to find the true killer. Once tricked into that belief, defendant could hardly refuse to answer Button's questions on the ground that he did not know the answers—Button was asking for his guesses. Defendant made statements about such things as the location of the murder weapon and the placement of wounds on the victim's body in reliance on Button's representation that he had a special "gift." His statements were involuntary, because he would not have made them had he known that the state

---

[9] The defendant in *Burdick* confessed. Contrary to the state's assertion, however, it makes no difference that "defendant's statements to police did not constitute a confession, but were, at most, admissions which, when coupled with other circumstances surrounding the crime, tended to incriminate him." According to *Miranda v. Arizona, supra:*

> "No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish between degrees of incrimination." 384 US at 476.

would disown that representation at trial and claim that defendant had incriminated himself by the accuracy of his guesses.

No one of these interrogation techniques, by itself, would necessarily have overborne defendant's will. Under the "totality of circumstances" test, however, we do not consider interrogation techniques one by one. The trial court should have suppressed all the evidence from the interrogation after Button threw the rights card in the wastebasket.

■ Although our conclusion that the trial court erred in denying the motion to suppress makes it unnecessary to consider defendant's final assignment of error, we do so because it is apt to be raised on retrial. Defendant argues that the trial court erred in allowing a police officer who was present when the murder weapon was found in the grass pile behind Lefell's house to give his opinion that "the hatchet appeared to have been there for quite awhile." The state had not qualified the officer as an expert on the subject. Defendant argues that the officer's

"assertions amounted to little more than choosing up sides, that his observations would be inadequate to support an opinion that the hatchet had been in the grass pile for a substantial period of time and that an expert would be required to tell whether or not a chrome-plated hatchet had been in the grass pile for a substantial period of time."

*State v. Lerch,* 296 Or 377, 677 P2d 678 (1984), upheld the admissibility of lay opinion testimony that fecal matter had caused a brown stain on linoleum and that decomposing human flesh had caused a certain odor emanating from a trash dumpster. The opinion notes that the admission of lay opinion evidence under OEC 701 may only be reversed for an abuse of discretion. 296 Or at 383.

"Apparent age" is one fact about which a lay witness may testify, according to the commentary to Oregon Evidence Code 701. *See also Youngbluth v. Peoples,* 50 Or App 289, 622 P2d 1144, *rev den* 290 Or 727 (1981) (police officer allowed to testify that malt liquor bottles he found were "fresh empties"). The officer observed the hatchet within moments of its discovery in the grass pile and was able to recount facts supporting his opinion: the area where the hatchet was found was comprised of old, brown, moist grass in the late stages of

decomposition. When he retrieved the hatchet, its face was caked with moist, decomposing grass. The trial court did not abuse its discretion in allowing the officer to give his opinion of how long the hatchet appeared to have been there.

Reversed and remanded for a new trial.