Argued and submitted February 27, affirmed May 22, reconsideration denied July 5, petition for review denied July 30, 1985 (299 Or 583)

## STATE OF OREGON,
*Respondent,*

*v.*

## DOUGLAS RAY EIDSON,
*Appellant.*

(10-83-09848, 10-83-09849, 10-83-09850;
CA A31725, A32580, A32581)

700 P2d 285

Sally L. Avera, Salem, argued the cause for appellant. With her on the brief was Gary D. Babcock, Public Defender, Salem.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

WARREN, J.

## WARREN, J.

Defendant was convicted of rape in the first degree, ORS 163.375, kidnapping in the first degree, ORS 163.235, and aggravated murder. ORS 163.095. The victim was a seven-year-old girl. Defendant was also convicted on three counts of unauthorized use of a motor vehicle. ORS 164.135. He appeals, assigning as error the trial court's denial of his motion to suppress statements that he made to the police. He contends that the statements were the product of custodial interrogation and were inadmissible, because they were made without advice of rights and an effective waiver of his rights to remain silent and to assistance of counsel, in violation of *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). He also contends that the statements were involuntary as the result of police coercion and trickery.

At 1:40 p.m. on December 12, 1983, defendant called the Eugene Police Department and reported the discovery of a body. Initially, he gave a false name to the dispatcher; however, he provided his true name before concluding the call. The police instructed defendant not to leave the pay phone from which he had placed the call. He remained near the booth until officer Truitt arrived about five minutes later.

Truitt asked defendant to direct him to the place where he had found the body. The two then traveled five or six blocks to a bike path along the west bank of the Willamette River approximately 1,000 feet north of the Valley River footbridge. During the drive, defendant seemed upset and indicated to the officer that he thought he was going to throw up. Truitt questioned him as to where the deceased was located and how he had discovered her. Defendant stated that he had been in the area searching for his stolen bicycle when he observed the body from a knoll 400 to 500 feet from where the two then stood.

Defendant took the officer to a trail leading down a muddy slope through briar bushes to the water's edge. As he followed, Truitt noticed that defendant's pants were wet up to his knees. The officer came upon the body of a young girl lying on the river bank. With the exception of her stockings, the child was unclad from the waist down. While defendant waited on the pathway within Truitt's sight, the officer confirmed that the unidentified youngster was dead. Truitt

immediately suspected foul play. Two other officers, Wells and Turner, arrived shortly.

Sergeants Cline and Parr were the first detectives to arrive; they reached the scene at 2:10 p.m. Cline conferred with Truitt and Wells, then performed a preliminary examination of the scene. He determined that the body had not been in the water long. In a search for evidence, Wells discovered a freshly disturbed area 50 yards from the child, where officers found a foil prophylactic wrapper and a small, blue, barrel-shaped purse. Cline asked defendant to tell what he knew about the situation. Defendant repeated the story he had given Truitt and stated that he had pulled the child from the river and attempted to revive her by compressing her chest.

Lab technicians arrived approximately 15 minutes after the conversation between defendant and Cline. While they stood some distance away from the body, Cline questioned defendant further concerning his activities and observations. Ultimately, Cline asked defendant to lead him to the knoll from which he claimed to have spotted the body. When Cline stood on the knoll looking down at the river, it appeared to him that it would be difficult to see a body from there, and he began to doubt defendant's account.

The officers were unable to figure out how defendant had pulled the girl from the river. In response to the officers' request, defendant demonstrated his claimed actions. As he stood talking to the officers, defendant began shaking. Thinking he might be cold, the officers invited him to sit in one of the patrol cars. He was joined there by Parr and Cline, and the three discussed the incident further while seated in the automobile.

Parr asked defendant if he would come down to the police station at City Hall to provide a detailed statement. Defendant agreed. On his arrival at the station around 4:30 p.m., defendant was given a cup of coffee and a warm place to dry his feet. Parr and Piquette, another detective, interrogated defendant regarding his activities on December 12 for approximately 75 minutes. He gave a detailed description of his activities from 7:10 a.m. until his meeting with Truitt. Defendant claimed that he had had no involvement in the crime.

Parr characterized defendant as having become a "potential suspect" by 6:30 p.m.

After the interview, Parr asked defendant if he would be willing to take a polygraph examination concerning his movements and involvement with the girl's body. Defendant stated that he had taken a lie detector test on a previous occasion and agreed to participate. The police made arrangements to administer the polygraph. It appeared that it would take some time before Detective Irvin could administer the test. Parr asked defendant if he wished to contact anyone who might be concerned with his whereabouts, and he requested permission to call his mother. He called his mother and told her that he had found a body in the river and was going to take a polygraph test at the police station. His mother asked to speak with the officer, who informed her that he would drive defendant home after the test.

At that point, Parr and Piquette asked defendant if he would like to have dinner with them while the test was prepared. Defendant accepted, and the three went to eat at Arby's, where they engaged in general conversation. They returned to the station around 8:00 p.m., and at 8:30 Parr escorted defendant into the polygraph examination room where Irvin was waiting.

Irvin explained the polygraph test to defendant. The officer then read through a "Polygraph Examination Statement of Consent," which contained *Miranda* warnings. Defendant indicated that he understood his rights and signed the form, consenting to the examination. The form reads as follows:

"He has explained to me that I do not have to make any statement regarding the offense for which I am suspected, that I have the right to remain silent, and that anything I say before, during and/or after the polygraph examination can and will be used against me in a court of law or other proceeding. He has also advised that I have a right to talk to a lawyer prior to this examination and have a lawyer present while I am being questioned. I also understand that if I cannot afford a lawyer, one will be appointed to represent me at public expense if I so request. I have also been advised that I have the right to stop this examination at any time.

"The nature of the polygraph examination has been

explained to me, and I understand that I cannot be required to submit to this examination without my consent. Understanding fully my rights as stated above, I do voluntarily, and without any threats, inducements or promises having been made to me, submit to this examination with the use of the polygraph."

Defendant was asked the following relevant questions: "Whether you did anything to cause the death of that little girl found in the river; do you intend to answer truthfully each question about that?" "Earlier today, did you, yourself, do anything to cause the death of that little girl found in the river?" "While down by the river today, did you, in any way, cause a little girl to die?" "At any time today, did you, yourself, take even one piece of clothing off that little girl found in the river?"

The polygraph examination was completed at 10:50 p.m. Irvin made no statements concerning its result at that time. He walked with defendant to the adjoining hallway, left him in the care of Cline and returned to the examination room to study the test charts.

During the period between 4:30 p.m. and 10:50 p.m., police had identified the deceased. Cline attended the child's autopsy and received the preliminary findings of the surgeon which were inconsistent with defendant's account of the events. Specifically, Cline learned that the victim had died by suffocation and that she had been assaulted sexually. Parr and Piquette also learned that defendant had been accused on a previous occasion of sexual assault on another girl and had pled guilty to a burglary in which one of the stolen items was a woman's underpants. Parr testified that he did not specifically recall communicating this information to Cline but that he "could very well have told him what I learned up to that point."

At 10:50 p.m., Cline took defendant into an interview room. Without again advising him of his *Miranda* rights, Cline asked him to relate what happened near the river. Cline testified that he did not believe defendant's account and thought that defendant was responsible for the crime or knew more than he had told.

"I told him that I had received some information that would tend to make me believe that he was responsible for the crime, or he had more knowledge than what he was telling me.

I think at that time I told him that I had determined that the girl had been sexually assaulted, questions along those lines. I told him, just looking at his face, he wouldn't keep eye contact with me. He kept dropping his eye contact. I got the impression there was something he was holding back, and he wanted to tell me about it but he just didn't want to say anything about it. I proceeded to tell him that I knew that he was being troubled about some problem about this particular thing, and to tell me what happened and he was going to have to tell somebody at some point in time. The conversation went on in this type of frame for about five or ten minutes at the very most. It was not very long.

"* * * * *

"* * * I asked the question if he was telling me the whole truth about this incident, and he responded, 'Yes,' but when he responded, it was a, I term it as a 'weak response.' It was very low and sort of dropping his voice. Also he dropped his eye contact, looking down toward the floor. I told him at that time that I thought he was lying to me about this thing and that he might as well tell me about it, he was going to have to tell someone sooner or later and he sat, I would estimate 15 to 20 seconds, it was not too long a period of time, and I told him to go ahead. 'Go ahead and tell me about this thing.' He made a statement, 'Okay, I did it.' That's a quote, 'Okay, I did it.' I asked him what he did, and he told me that he killed a little girl."

At that point, Cline invited Irvin into the room. Cline read defendant his *Miranda* rights, which he indicated that he understood. Cline testified that he had assumed that Irvin had read defendant his rights before the polygraph examination but had not been told that that had happened. The detectives continued to talk with defendant for about two hours to draw out the true story. Defendant made a tape recorded statement at approximately 1:00 a.m., admitting the crime. They continued to talk, and defendant gave a videotaped confession at approximately 4:30 a.m., in which he admitted abducting, raping and killing the child.

Defendant moved before trial to suppress all of his statements on the ground that they had been obtained in violation of *Miranda v. Arizona, supra,*[1] and were involuntary.

---

[1] Defendant's motion to suppress and argument thereon was based on "*Miranda v. Arizona* and it's [sic] Oregon progeny." All of the state and federal cases that

The state argued that defendant was not in custody until after he had made the incriminating statement. The state argued alternatively that, if he was in custody, the warnings given before the polygraph exam extended to the post-polygraph questioning and that the circumstances indicated that defendant had waived his rights to the assistance of counsel and to protection from compulsory self-incrimination. The trial court denied the motion, ruling "that at the time of defendant's statements to Sgt. Cline acknowledging his complicity, nothing had occurred raising a duty on the part of the police to advise the defendant of his Miranda rights * * *." Because it cannot be disputed that defendant was interrogated at the time when he made the incriminating statement, we understand the court's ruling to mean that defendant was not in custody at the time and that is the first issue we consider.

■　　*Miranda* requires that prophylactic warnings be given when a person is subjected to "custodial interrogation." Much of the litigation in this area concerns the issue of whether a person was "in custody" at the time of police interrogation. In *Miranda,* the court stated:

> "* * * By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. * * *" 384 US at 444.

The Court subsequently clarified that definition by applying an objective test to determine if a person was "deprived of his freedom of action in any significant way." *Berkemer v. McCarty,* 468 US ___, 104 S Ct 3138, 82 L Ed 2d 317, 336 (1984), holds:

> "* * * A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. * * *"

*See also State v. Swader,* 72 Or App 593, 697 P2d 557 (1985).

■　　Applying that standard to the facts of the case at bar, we hold that the trial court erred in ruling that defendant was not in custody at the time of his incriminating statement. At

---

defendant cites considered only the federal constitution. Defendant's motion was based solely on the federal constitution, and this opinion will deal only with federal constitutional law.

that point defendant had been in the presence of police for over nine uninterrupted hours, five of which were spent behind locked doors in the police station. Defendant had just completed a polygraph exam in which he gave false statements, denying his part in the crime. He reasonably could have thought that the test had disclosed his deception. Irvin admitted that he "probably had some idea" that defendant had lied by the completion of the exam, although he stated that he did not communicate any opinion to anyone until he had analyzed the charts.

After the test, Irvin turned defendant over to Cline, who took defendant into another room. Defendant was not driven home after the exam, as Parr stated he would be. In talking with Cline, he was confronted with an accusation that he had been lying and that he was responsible for the crime. Defendant knew that Cline had evidence that controverted his story and reasonably could have thought that Irvin somehow had indicated that the polygraph had revealed his deception. We hold that, considering the totality of the circumstances, a reasonable person in defendant's position would have felt that he was not free to leave the police station at that time. Defendant was subjected to custodial interrogation by Cline after the polygraph exam.

■ Defendant also argues that the *Miranda* warnings which he received before the polygraph examination were not adequate to inform him that his rights extended to post-polygraph questioning. We do not agree. Defendant was advised that he had the right to remain silent and that anything he said "before, during and/or after the polygraph examination" could be used against him. He was also advised that he had a right to have a lawyer present "while I am being questioned" and that a lawyer would be appointed for him if he could not afford one. Defendant indicated that he fully understood his rights. The warnings complied with *Miranda* and were sufficient to apprise defendant that his rights applied to post-polygraph questioning as well as to the examination itself, at least in the circumstances of this case, in which the inculpatory statement was made within ten minutes of the completion of the polygraph test.

Our ruling that the pre-test warnings carried over to post-test interrogation finds support in *Wyrick v. Fields,* 459

US 42, 103 S Ct 394, 74 L Ed 2d 214 (1982). In that case, the defendant had requested a polygraph examination and had received *Miranda* warnings before the test. At the conclusion of the test, the examiner told the defendant that the test indicated deceit and asked him if he could explain what was bothering him. The defendant then made an inculpatory statement. The Supreme Court held that the post-test questioning did not call for a fresh set of warnings. The Court held that merely disconnecting the test equipment did not effectuate a significant change in the character of the interrogation and could not remove the knowledge of his constitutional rights from the defendant's mind.

The only facts which distinguish *Wyrick* from the case at bar are that the post-test questioning here occurred in another room and was conducted by a different officer. We do not think that those facts compel a different conclusion. In both cases, the defendants were charged with having lied. The fact that the post-test accusation was made by a different officer in another room is not significant, because it occurred within ten minutes of the completion of the test. The change of officer and room could not reasonably have erased defendant's knowledge of his rights from his mind. *See State v. Johnson,* 47 Or App 1165, 1169, 615 P2d 1181 (1980).[2]

■■ A more difficult question is whether defendant had effectively waived his rights before he made the incriminating statement. The written waiver which he signed before the polygraph exam stated: "I do voluntarily * * * submit to this examination with the use of the polygraph." That waiver was limited explicitly to questioning during the examination and

---

[2] In *State v. Johnson, supra,* we assumed that a pre-polygraph advice of *Miranda* rights carried over to post-test questioning. That case was remanded for a determination whether the defendant had waived his rights with respect to post-polygraph questioning and whether statements made after the examination were voluntary. The proceedings in that case differ from those in this case, because there

"[t]he state did not request, and the court did not hold, a hearing to determine whether the admissions were voluntary * * *. Nor was a hearing held to determine whether, as to the post-polygraph admissions, defendant waived his Miranda rights." 47 Or App at 1168-69.

In the instant case, both the voluntariness and the waiver issues were raised and tried below. For that reason, we need not remand the case for those determinations, as discussed, *infra.*

cannot be construed to apply to post-test interrogation. Nevertheless, a waiver of the constitutional rights guaranteed by *Miranda* need not be explicit.

> "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." *North Carolina v. Butler,* 441 US 369, 373, 99 S Ct 1755, 60 L Ed 2d 286 (1979). (Footnote omitted.)

Certain of the actions and circumstances which are relevant to a determination of whether a waiver may be inferred were discussed in *State v. Davidson,* 252 Or 617, 620-21, 451 P2d 481 (1969):

> "* * * There was evidence that the warning was given in simple terms and that defendant, a person of apparently normal intelligence, stated that he understood the warning and thereafter made the statements without any prolonged period of questioning or coercive atmosphere. It is not always necessary to articulate a waiver. It may be shown by the manner in which the questions are asked, the responses that are made, the age, experience and intelligence of the person being questioned as well as all the other surrounding circumstances. Any clear and unambiguous conduct by a person who has been advised of his rights which indicates his willingness to answer questions without a lawyer is sufficient. * * *"

In that case, the defendant was served with a warrant while he was in custody at the city jail charging him with crimes other than that for which he was in custody. He immediately was advised of his rights and transported to the county jail. Within 30 minutes of his arrival at the county jail, he was asked a question by an officer, to which he gave an incriminating response. The court held that the circumstances supported the trial court's ruling that the defendant had waived his rights.

*See also United States v. Hilliker,* 436 F2d 101 (9th Cir 1970), *cert den* 401 US 958 (1971); *State v. O'Keefe,* 40 Or App 685, 692-93, 596 P2d 987, *rev den* 288 Or 81 (1979).

■　　In the case at bar, the trial court did not reach the issue of whether defendant had waived his *Miranda* rights in the post-test questioning, because it ruled that defendant was not in custody at the time. The question of whether defendant made a voluntary and intelligent waiver of his rights is a question of law, as to which an appellate court is obliged to make an independent determination. *Davis v. North Carolina,* 384 US 737, 741-42, 86 S Ct 1761, 16 L Ed 2d 895 (1966); *State v. Warner,* 284 Or 147, 158-59, 585 P2d 681 (1978); *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968).

Although in this case the trial court made no ruling on the validity of the waiver, the prosecution argued at the hearing that defendant had waived his rights and presented evidence relevant to that determination. We have thoroughly reviewed the record and conclude that the testimony as to what transpired between the police and defendant on December 12-13, 1983, is uncontroverted.[3] Had the trial court considered the evidence and concluded that defendant's waiver was voluntary, it would still be our responsibility to make the determination anew, on our review of the record. For this reason, we think it is within our authority to determine whether defendant waived his rights.

■　　We conclude that defendant waived the rights guaranteed by *Miranda* during the post-test questioning. He had received *Miranda* warnings and had indicated that he understood his rights. The questioning to which he was subjected cannot be considered coercive, nor was it prolonged, for defendant confessed within ten minutes of the beginning of Cline's interrogation. Defendant was confronted with the officer's suspicion that he was holding something back and that it was troubling him, and he was encouraged to get it off his chest. Defendant sat quietly for 15 to 20 seconds, apparently considering his options. At no time while he was with the police did he ask to speak with a lawyer or to leave the officer's

---

[3] The state presented five witnesses, the person who received defendant's call to the Eugene police and officers Truitt, Parr, Irvin and Cline. The defense presented two witnesses, officers Turner and Piquette. All of the witnesses' testimony was consistent.

presence. He was described by all of the officers as cooperative in the investigation. We conclude from those unequivocal actions that, in responding to the officer's questions, defendant intelligently and voluntarily waived his rights to consult with an attorney and to remain silent.

■ ■ The final ground that defendant asserts is that his confession was not voluntary. The test is whether, in the light of surrounding circumstances, the confession was the product of an essentially free and unconstrained choice or if defendant's will was overborne and his capacity for self-determination critically impaired. *Schneckloth v. Bustamonte*, 412 US 218, 225, 93 S Ct 2041, 36 L Ed 2d 854 (1973). The trial court did conclude that defendant's will was "not overthrown" and that his statements were freely and voluntarily given. On our review of the evidence, we agree with this conclusion.

There is no evidence of any deceptive or coercive tactics on the part of the police. *Compare State v. Cochran*, 72 Or App 499, 696 P2d 1114 (1985); *State v. Burdick*, 57 Or App 601, 606, 646 P2d 91 (1982). Cline was truthful when he told defendant that there was evidence that the victim had been sexually assaulted and that defendant may have been involved in the crime. He did not promise that defendant would be treated more leniently if he confessed, nor did he threaten him. *See* ORS 136.425(1); *State v. Swader, supra.* Although Cline's actions clearly were intended to encourage defendant to tell what he knew, we cannot say that they were coercive.

Affirmed.