No. 91,755

STATE OF KANSAS, *Appellee,* v. WORD ACKWARD, JR.,
*Appellant.*
(128 P.3d 382)

Opinion filed February 10, 2006.

*Thomas W. Bartee*, chief defender, NE Conflict Office, argued the cause, and *Cory D. Riddle*, deputy appellate defender, was on the brief for appellant.

*Amy M. Memmer*, assistant district attorney, argued the cause, and *Robert D. Hecht*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Word Ackward, Jr. was convicted by a jury of one count of felony murder and one count of attempted possession of marijuana with intent to sell or distribute. He was sentenced to life imprisonment for felony murder and 14 months on the drug charge to run concurrently with the life sentence. He appeals his convictions.

Ackward raises the following issues, which we list in the order we will consider them.

1. WAS THERE SUBSTANTIAL COMPETENT EVIDENCE TO SUPPORT THE DISTRICT COURT'S DETERMINATION THAT ACKWARD'S STATEMENT TO POLICE WAS VOLUNTARY?

2. DID THE DISTRICT COURT ERR IN DENYING ACKWARD'S MOTION TO SUPPRESS THE GUN?

3. DID THE JURY INSTRUCTION ON SELF-DEFENSE PROPERLY AND FAIRLY STATE THE LAW AS APPLIED TO THE FACTS OF THE CASE?

4. DID THE DISTRICT COURT ABUSE ITS DISCRETION IN ADMITTING A PHOTOGRAPH OF THE VICTIM?

5. DID THE DISTRICT COURT ABUSE ITS DISCRETION IN REFUSING TO STRIKE TWO PROSPECTIVE JURORS FOR CAUSE?

6. DID CUMULATIVE ERRORS DEPRIVE ACKWARD OF A FAIR TRIAL?

Joshua Buckman died on February 12, 2003, as the result of a gunshot that entered his lower left back and damaged his liver, kidney, and right lung and caused extensive hemorrhaging before exiting from the right side of his chest. A second gunshot entered the outer aspect of his left upper arm and exited higher up on the inner part of the arm. Buckman bled to death, which gave him time to move some distance from where he was shot before losing consciousness.

Earlier that evening, Buckman, who lived in Ozawkie, stopped by the house of his friend, Nathan Wells, who lived in Meriden. They were bored and decided to drive Buckman's car to Topeka to look for something to do. At Buckman's request, Wells loaned him $100. Buckman drove. Wells uses a wheelchair and is able to drive only with hand controls.

As he was driving south on Topeka Boulevard, Buckman used Wells' cellular telephone to call friends and find something to do. At the Total station at 29th and Indiana, Buckman got some gasoline, checked the oil, and talked with someone interested in buy-

ing his car. Wells waited in Buckman's car. Buckman continued to make calls on Wells' telephone after they left the station.

When they had driven almost to Topeka Boulevard, Buckman turned around and headed back to the Total station. He told Wells he was going to meet his friends there. Buckman parked on the east side of the building. Wells' telephone rang. He did not recognize the number, but Buckman did, and he answered. After hanging up, Buckman told Wells that his friends were going to be pulling into the station soon and that he and Wells would follow them around to the apartments behind there.

Two males, who Wells did not recognize, drove into the station from south on Indiana in a gold Nissan Maxima with a temporary tag. Buckman said they were his friends and followed them. Buckman referred to one of the men as "Word."

When they got to the parking lot of a nearby apartment complex, the driver of the Nissan backed into a stall. Buckman pulled in next to the Nissan so that the drivers' sides of the two cars were closest together. Wells assumed they were going to be hanging out with some of Buckman's friends at the apartment complex, and he asked Buckman to make sure the wheelchair could get in. Buckman and the defendant, who was the Nissan driver, got out of their cars. Buckman and Ackward walked toward the apartments, and Wells lost sight of them.

Buckman had left his window down. The passenger in the Nissan rolled down its driver's side window. Wells did not know either the driver or the passenger of the Nissan. After a few minutes, Wells heard two gunshots, one right after the other. They sounded fairly close.

The Nissan passenger was Mario Oneal. Oneal slid over to the driver's seat and pointed a gun out the window at Wells. He told Wells to put his hands up and asked if he had any money. As Wells was saying that he did not have any money, the defendant came running toward the car with a gun in his hand. The defendant yelled, "I got money, I got money." Oneal, who had slid into the driver's seat, began pulling out of the stall as defendant jumped in the car. With squealing tires, they drove out of the apartment parking lot and north on Kentucky to 29th, where Wells lost sight of

them. In the car, Ackward told Oneal that he and Buckman fought and Ackward shot Buckman twice.

Wells yelled at a woman who came out of the apartments, asking if she would look for his friend. Then he called 911. When police arrived, Wells told them what had happened and gave them the last telephone number from which Buckman had received a call.

Police found Buckman lying on the second floor landing. He had no weapons or money on or around him.

Police found a spent round on the second floor landing. In the third floor hallway, police found a blood smear on the baseboard, an undamaged bullet, an indentation in the wall, and blood on the fire door. The fire alarm on the third floor had been pulled. The bullets police found were 9 millimeter rounds. Two 9 millimeter shell casings were found outside the apartment building.

On the third floor, officers knocked on apartment doors to check on occupants. The manager provided a master key that provided access to apartments where no one responded. When there was no response at apartment 305, officers entered to look for other victims. On a table in the living room they saw a brick of green vegetation, a small scale, and more green vegetation in a bowl. It appeared to be marijuana. Police found no one in apartment 305. It was secured as a possible crime scene.

When Venus Triplett later arrived, it was determined that he lived in the apartment. Triplett testified that he did not know Ackward personally but that he knew of him. Triplett denied speaking to Ackward at any time on February 12, 2003. Triplett also denied knowing the name, Joshua Buckman.

We first consider whether Ackward's statement to police was voluntary.

The telephone number Wells gave police was traced to Word Ackward, Sr., and officers went to his house at approximately 3 a.m. on February 13 to question him. Ackward, Sr., told police that his son was carrying the phone. The father called his son, and then he gave the telephone to Detective Hill, who said he needed to talk to Ackward, Jr., about a shooting. Claiming to be in Wichita, defendant agreed to speak with police the next morning. The

morning of February 13, defendant and his father went to the police station.

Before trial, defendant filed a motion to suppress his statement to police. He alleged that his statement was the product of coercive tactics by interrogating officers, including false information, religious appeals, and misrepresentation of the law. The trial court held a *Jackson v. Denno* hearing. In addition to the evidence presented at the hearing, the trial court reviewed a videotape of defendant's interrogation, a transcript of the videotape, and oral and written arguments of the parties. The trial court ruled as follows:

"1. The Court did not find that the statements made by the Defendant were involuntary.

"2. Specifically, the Court ruled that the defendant, though young, was able to converse with the detectives as a mature individual.

"3. The Court also found that although the time of interrogation was lengthy there were breaks and the Defendant did not appear to be under any real stress.

"4. In addition, the Court found that the religious arguments did not appear to have any effect on the Defendant.

"5. The Court found that the Defendant was not isolated from hi[s] family in that he had opportunities to speak with his father, and the threat of prosecuting his father for tampering with evidence was not significant in making the statement involuntary.

"6. The Court also found that the deceptive practices of the detectives including false evidence, fake witness testimony and misstatements about the law and the type of sentence he might be facing did not make the Defendant's statement involuntary.

"7. The Court did find that the Defendant's statement should be suppressed from the time he first inquired about receiving an attorney. The Court found that the 'request for the attorney is significant and conclusive,' and the Defendant made such a request eight times."

Thus, at trial the jury was not shown the entire videotape of defendant's interrogation. The portion of the interrogation that occurred after Ackward requested an attorney was edited out of the videotape that was admitted into evidence. On appeal, Ackward contends that statements he made to police during the admissible portion of the interrogation were involuntary and should have been suppressed because police used coercive tactics in eliciting them. On appeal, as in the trial court, Ackward complains the police improperly used false information, religious references, and misrep-

resentations of the law. In addition, he complains of false claims of contacts with the prosecuting attorney.

In reviewing a district court's decision regarding suppression, this court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. This court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Swanigan*, 279 Kan. 18, 23, 106 P.3d 39 (2005).

In determining whether a confession is voluntary, a court considers the totality of the circumstances. Factors bearing on the voluntariness of an accused's statement include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. 279 Kan. at 23-24.

## Duration of the Interrogation

Defendant makes only one passing reference to the "prolonged nature of the questioning." Ackward does not urge the court to consider duration of the interrogation as a significant factor bearing on the voluntariness of his statement. At the suppression hearing, the prosecuting attorney told the trial court that defendant spent about 8½ hours with the interrogating detectives. Defendant testified that the interrogation lasted 8 or 9 hours. Defendant was given a number of breaks, and he was allowed to leave the interrogation room several times during the interrogation period, including to be driven to 1811 SW Lincoln in search of the gun.

## Ability to Communicate with Outside World

Ackward has no complaint about being able to communicate with the outside world. He was allowed to keep his cell phone and telephoned his father and someone else several times while left alone in the interrogation room. In addition, when the defendant

asked to speak with his father, the father came to the police station and was left alone with his son in the interrogation room.

## Age, Intellect, and Background

Defendant was 20 years old. He did not graduate from high school. When writing out his statement, Ackward asked the officer how to spell "stay." Defendant also suggests that his telephone calls to his father show that he was scared and immature. The State points out that the trial judge's second finding was "that the defendant, though young, was able to converse with the detectives as a mature individual."

## Fairness of the Officers in Conducting the Interrogation

(1) False information. Ackward complains that the police falsely told him a surveillance camera recorded him and Buckman at the Total station shortly before the shooting, his hands were being swabbed for a gunshot residue analysis that would show whether he had fired or even held a gun within 48 hours, there were multiple eyewitnesses at the apartment complex, another person was cooperating and had strong incentive to do so to avoid prison time, and a police report showed that defendant always carried a gun. At the suppression hearing, Detective Hill, who was the lead detective and conducted most of the interrogation, was asked about all these claims except the person who was cooperating to avoid prison time. Hill admitted the deceptions.

Defendant relies principally on *Frazier v. Cupp*, 394 U.S. 731, 739, 22 L. Ed. 2d 684, 89 S. Ct. 1420 (1969), in which the Supreme Court concluded: "The fact that the police misrepresented the statements that [defendant's cousin] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible." In *Swanigan*, 279 Kan. 18, 31-32, this court considered the argument that repeated police use of false information overcame the defendant's will:

"In *State v. Wakefield*, 267 Kan. 116, 977 P.2d 941 (1999), this court considered whether the defendant's statements were coerced when officers falsely represented that they had information and evidence implicating him in a murder. The district court found that although the detective lied in saying the defendant's

fingerprints were upstairs, these were bluffs successfully used to convince him to make certain statements in response.

"In *Wakefield*, we observed that in *Frazier v. Cupp*, 394 U.S. 731, 22 L. Ed. 2d 684, 89 S. Ct. 1420 (1969), the United States Supreme Court held that a questioning officer's false statement to the defendant that the defendant's cousin had been brought in and confessed, when viewed as part of the totality of the circumstances, was insufficient to make the otherwise voluntary confession inadmissible. 267 Kan. at 128. Accordingly, we concluded, after reviewing the totality of the circumstances, that fingerprint misrepresentations to defendant Wakefield during the law enforcement interviews did not alone make his confession involuntary." 279 Kan. at 32.

But the court concluded that the repeated use of false information *combined with* Swanigan's low intelligence and susceptibility to being overcome by anxiety and police threats and promises constituted coercion that produced an involuntary statement. 279 Kan. at 39.

Ackward cites no good authority in which false information alone fatally tainted a defendant's statement to police. In addition to *Frazier*, he cites *State v. Allies*, 186 Mont. 99, 606 P.2d 1043 (1979), which has been overruled, and *State v. Cochran*, 72 Or. App. 499, 696 P.2d 1114 (1985). In *Cochran*, a police officer used a method of questioning a murder suspect that the court described as "an interview technique that he invented," 72 Or. App. at 505, and that technique generated much more discussion by the court than false information. The Oregon court concluded that the unorthodox interrogation technique, which seems to have convinced Cochran he had supernatural abilities, combined with other factors to overcome defendant's will. 72 Or. App. at 516. The other factors included: the officer's depreciating the seriousness of the interrogation and frustrating the purpose of the *Miranda* warnings by saying, "[I]f I thought you'd killed her, I wouldn't do this," and throwing the rights card defendant had signed into the wastebasket; the officer's promoting defendant's dependence on him by playing the good guy to another officer's bad guy; and subjecting defendant's hands to a contrived "black light analysis" and falsely telling him the glow indicated blood. 72 Or. App. at 512-15.

The State cites this court's decision in *State v. Harris*, 279 Kan. 163, 170, 105 P.3d 1258 (2005), where the court cited *State v.*

*Wakefield*, 267 Kan. 116, 128, 977 P.2d 941 (1999), for the controlling principle that "[d]eceptive interrogation techniques alone do not establish coercion." The State also notes that in *Swanigan* the court stated: "[U]nder *Wakefield* Salina police were free to lie about evidence that fingerprints were found at the Kwik Shop and confirmed to be Swanigan's." 279 Kan. at 32. The court continued: "However, also under *Wakefield*, the false information must be viewed as a circumstance in conjunction with others, *e.g.*, additional police interrogation tactics." 279 Kan. at 32.

(2) Religious references. The theme of religion was tied in by the police with defendant's relationship with his father. Among the officers' comments on religion are the following:

"I talked to your dad last night and he gave me the impression, he said he'd been going back to church and he was a little wilder when he was younger but he's got his life on track and stuff. But he's been trying to have you and your brother and stuff go to church and go that route and he knows you're out here in the streets running and doing whatever you're doing out here. This is pretty serious. In fact, this is damn serious. You know it. That's why you're down here. You still going on to church at all?"

"Q. . . . [W]hen was the last time you been to church?
"A. Last Sunday.
"Q. Okay. You know the deal, right? I mean, this is one world here but there's a whole other world you got to answer to."

"Okay. Now this stuff, you know, I mean this is biblical in the fact that you know anything that happens in the dark is going to be shown in the light, man. And you're going to have to do the right thing here and you're up against it. I mean, it's you doing the right thing or it's you getting hammered, man. So why don't I turn the page here and let's forget about this. Let's talk truthfully about what happened . . . ."

"Um, I'm about to the point where I've exhausted all my means to assist you. I think you're being kind of a hardhead at this point. That little voice we talked about out there that's talking to you though, see, because just like anything else in our life, you got that voice telling you and you know what it is because your daddy has got you in church, but it's telling you to do one thing but our minds, we want to do something else."

Defendant concedes that in *State v. Cobb*, 30 Kan. App. 2d 544, 559, 43 P.3d 855 (2002), an opinion written by now Justice Beier, the Court of Appeals did not find that the defendant's incriminating statements were involuntary in spite of "constant and perva-

sive" references to religion by the police. But Ackward would distinguish *Cobb* on the ground that Cobb was mature and invited the religious discussion. It is true that Ackward did not invite the religious discussion, but, as already noted, he was not of an especially tender age and the trial judge, who had the opportunity to observe defendant in person, perceived him as being mature. The State contrasts the constant and pervasive religious references in *Cobb* with the few brief mentions of religion in the present case. The religious references in the admissible portion of Ackward's interrogation are subtle compared with the fervid examples set out in the *Cobb* opinion. See 30 Kan. App. 2d at 550. The intensity of the religious talk in the present case grew significantly after Ackward said he wanted to talk with an attorney, but, because those statements were suppressed by the trial court, the heightened religious appeals are not at issue here. In the circumstances of this case, the officers' references to religion alone were not so coercive as to make Ackward's statement involuntary.

(3) Misrepresentations of the law. (a) Benefit from confessing. Defendant complains of Detective Hill's implying that a confession would get him more lenient treatment and a failure to confess would have negative repercussions. He does not quote specific language or cite to a specific time in the video. We assume the following statements by Hill are ones at issue:

"Okay. Well, you know there's a lot of ways to do stuff, okay, and if you wanted to talk to me all openly and honestly about everything that we are going to do here, then I'll do what I can do to help you out, okay? And there's a lot of ways these cookies can fall on the table, okay?"

"In this scenario, somebody is going to talk to us. Either you're going to talk to us or Trey is going to talk to us, okay, and somebody is going to be a fat puppy and get the breaks and the other cat ain't so, I mean, you haven't come up with an explanation as to why you guys were in that lot and I know you was there. I can put you guys in that lot in your car, okay, prior to this shooting. So you're either witnessing this thing or you're involved in it or you know something about it and you're scared, okay?

"And as soon as I get out of here, I'm going to go talk to these detectives here in about five minutes and I'll find out which one it is because they're talking to people. But if you wanted to talk to me now, this would be the time that I'm going to write something favorable in the report and I'm going to take your story, okay? . . . I mean, you keeping your mouth shut about just telling me part truth

makes you look even guiltier than what you may be, you know what I mean, because I know more truth than what you're telling me. There's part of the story I don't have and that's what you can provide and that part of the story you provide me is the most important part. It's the part that actually gives you a break as far as maybe the court is concerned as to what your charges might be or not, man. Okay? It's the difference in a big sentence and a small sentence."

Defendant cites *State v. Newfield*, 229 Kan. 347, 359, 623 P.2d 1349 (1981) (quoting *State v. Kornstett*, 62 Kan. 221, 227, 61 Pac. 805 [1900]): " 'It is well settled that an extrajudicial confession will not be received in evidence unless it has been freely and voluntarily made. If it has been extorted by fear or induced by hope of profit, benefit, or amelioration, it will be excluded as involuntary.' "

The State directs the court's attention to *Swanigan*, but the subject in that case was not an implied benefit from confessing but rather an implied or express detriment from defendant's lack of cooperation, which may amount to suggesting to a suspect that his or her exercise of the constitutional right to remain silent may result in harsher treatment. 279 Kan. at 34-35. Even in the implied detriment circumstance of *Swanigan*, however, the court did "not regard this tactic as one which makes the confession involuntary per se." 279 Kan. at 37.

(b) Way in which shooting occurred. Detective Hill suggested to defendant that it would be better for him if the shooting occurred in certain ways:

"There's a lot of reasons that people get shot. Sometimes people get shot for reasons that they don't even get arrested for, you know, like there's self-defense. I don't know this is going to be quite a self-defense but this could be some kind of argument deal, because they got people saying that this guy was screaming and yelling and stuff like there was something going on, so maybe there was an argument or something like this that's ensuing, I don't know. So there's a difference between you calling somebody to sell them some weed and then setting them up and just robbing them and them getting shot as opposed to you calling somebody to sell them some weed and then they show up and you just freaking kill them because you didn't like them for whatever reasons. Those are different scenarios. One is worse than the other one, okay? There's a difference between you guys getting over there and doing a drug deal and it goes to shit and this kid end up getting shot."

"[W]hatever your reason was, which usually when I talk to people, they come up—they tell me what the argument was about or what happened, their reasoning

usually lowers their charges and there's a big difference between some reckless death as opposed to a first-degree murder. Do you understand that? I mean, you are talking years and years and years, man. There's a difference between somebody being paroled after three years and somebody going away for 25 years."

"I'm going to give you every opportunity to do the right thing here, okay, because, I mean, it's point blank simple. Either you or your friend one shot this kid, okay? And the reason as to why he got shot makes all the difference in the world."

The State denies that it was misleading for Hill in the first paragraph quoted above to suggest to defendant that there are significant legal differences between felony murder and premeditated murder and between shooting someone because a drug deal went bad and because you do not like them. What Hill says in the second quoted paragraph about reckless homicide differing from first-degree murder may be accurate as a matter of law, but reckless homicide is not likely to be within the contemplation of the interrogating officer in the circumstances and when the victim was shot in the back. It probably was misleading for Hill to be contrasting the punishment for reckless homicide with that for first-degree murder in the circumstances of this case. In the third quoted paragraph, the officer reiterates the proposition that the motive for the killing is highly significant.

Defendant cites no Kansas cases to support his position that the officers' misrepresentations of the law render his statement inadmissible. The State again relies on *Harris*, where police officers used "themes and options" in questioning the defendant.

"One of the themes was that the shooting was premeditated and that Harris had planned to kill the victim. Another theme eliminated the premeditation and suggested that Harris had been involved in a drug deal that went bad, requiring Harris to shoot the victim to defend himself. Detective Chisholm encouraged Harris to be truthful about what he was thinking at the time of the shooting to prevent a premeditated murder conviction with the potential for a 50-year minimum sentence." 279 Kan. at 171.

The court determined that the interrogating officer

"properly stated the difference between premeditated murder and felony murder and informed Harris about potential sentencing differences between the two crimes. There is no indication that Harris' independent will was overcome by Detective Chisholm's forthright comments about possible charges. Harris knew at the beginning of the interrogation that it involved a murder. His failure to

understand the elements of felony murder does not make his confession involuntary." 279 Kan. at 172.

Another of Detective Hill's questionable statements is similar to his suggesting that Buckman's death might be due to reckless homicide, but in this instance Hill is suggesting that the use of force may have been justified. In the circumstances of this case, where the victim died when shot in the back, neither perfect nor imperfect self-defense is likely to be applicable. In addition, Hill's statement may not be a misrepresentation as applied to a law enforcement officer, but it probably would be a misrepresentation of the law for a "citizen" aggressor. Hill's intention seems to have been for Ackward to think the statement applied to him, and Ackward's response indicates that he took the statement as intended:

"Q. . . . You're going to have gunpowder residue on your hands. I got a witness that saw you running away with a gun in your hand, okay? A witness upstairs that saw you shooting. So where are we going to go with this? I don't know what he had. Maybe he had something that looked like a gun, maybe he turned around real quick and you got scared because, you know, I can tell you this, as police officers, you know, I've probably done, I don't know, 2000 drug raids and if I go into a house and I got my gun out because it's a dangerous situation and a cat— and I say stop or something and he starts reaching underneath the mattress and he doesn't quit, you know if I shoot that guy I'm going to tell you, I'm going to be okay because there's case law out there, there's been cases that supported that. He can turn around and can pull a gun out and shoot me quicker than I can pull the trigger. He may just have been reaching for his bag of dope but I can tell you, I'm going to be all right because I know that because that's what we are trained on. This guy has got something in his jacket and just moves real quick. You don't know if it's a gun or it ain't a gun.
"A. That's the way he pulled it out."

In summary, the most significant factor bearing on the voluntariness of Ackward's statement is the fairness of Detective Hill in conducting the interrogation. The transcript of the interrogation reveals his repeated use of false information, phony forensic analysis, and religious references, as well as several misleading statements about the law. The essential inquiry in determining the voluntariness of Ackward's statement is whether in the totality of the circumstances the statement was the product of his free and independent will.

In *Swanigan,* we concluded that the defendant's statement was involuntary and should be suppressed. We did so based upon the totality of the circumstances, and two factors were crucial in our determination that Swanigan's statement was involuntary. One was Swanigan's IQ of 76, and the other was his susceptibility of being overcome by anxiety. Further, the record showed "that Swanigan's numerous changes in his story, whether in denial or in confession, usually occurred shortly after the officers lied to or threatened him." 279 Kan. 40. Here, the trial court found Ackward was mature, did not appear to be under stress, and was not swayed by religious references or misstatements of law or fact. The religious references were subtle, and the mistakes in fact and law were not egregious, and in some cases they were more an exaggeration rather than false. There were witnesses who placed the defendant at the Total station and with the victim at the apartment, and Wells identified the defendant as the driver of the gold Nissan Maxima, running from the apartment with a gun in his hand, and driving off in the Maxima. There was no evidence that Ackward had a low IQ or below normal intelligence. We conclude, under the totality of the circumstances, that Ackward's statement was the product of his free and independent will. The district court did not err in finding Ackward's statement was voluntary.

Ackward next asserts that the district court erred in denying his motion to suppress the gun.

During defendant's interrogation, he asked to talk to his father. Summoned by police to the station, Ackward, Sr., went into the interview room with his son. The two were left alone, but their conversation was being monitored. They talked about something being located at a woman's house "under the wood." Ackward, Sr., asked, "On the other side of the house, lift the wood up?" Then just before leaving the interrogation room, Ackward, Sr., said, "I'll go check that out."

When Ackward, Sr., left the police station, officers followed him to 1811 SW Lincoln where he spoke with two women and then began looking on the south side of the house. When he went to the north side of the house, Ackward, Sr., lifted up some wood, put on gloves, and then picked something up. He walked to his

truck and left. When stopped by officers, he had a magazine with ammunition in it. Officers began searching around the house at 1811 SW Lincoln.

Shortly after Ackward, Sr., left the police station, the defendant requested a lawyer. The trial judge ordered the suppression of defendant's subsequent statements. During the suppressed part of the interrogation, defendant agreed to go with officers to show them where the gun was hidden. While officers were searching around 1811 SW Lincoln, defendant was taken there. He pointed out the crawl space entrance of 1815 SW Lincoln, the house to the south of 1811 SW Lincoln, where police found a gun under the wooden cover.

Defendant filed a motion to suppress the gun on the ground that the gun was the physical fruit of a *Miranda* violation in that he revealed the location of the gun after requesting an attorney and not having his request honored. The State's position was that the gun was admissible because it inevitably would have been discovered without the defendant's direction. The trial court conducted an evidentiary hearing at which the State presented the testimony of four police officers.

Sergeant Wilson testified that he and three other police officers were planning to do a line search from front to back of the narrow space between 1811 SW Lincoln and the house south of it when Officer Hill arrived with the defendant. The plan for the line search was for the officers to walk shoulder-to-shoulder from the front to the back of the houses conducting a visual search and work their way back turning things over and physically searching the area. The crawl space cover of the house south of 1811 SW Lincoln lay in the area they planned on covering. According to Sergeant Wilson, they would have lifted the wooden cover of the crawl space during the physical search as they worked their way from the back to the front of the houses.

The trial judge ruled after hearing the evidence and arguments of counsel:

"Well, in my judgment, of course, inevitable means—the dictionary definition of that would be unquestionably or with great certainty or I guess we could go on and on. But, in my judgment, the law and the cases seem to give it a reasonable

definition of that. And in my judgment, the discovery of this gun would have been inevitable. I don't know that the timing is all that critical, but it doesn't seem that there is any specific time limit on discovery. It's just that it will happen. And in my judgment it would have happened.

"I'm quite impressed with Sergeant Wilson's testimony. By the time—at the time he was called away from his search, he was very close to the piece of plywood that all you had to do was lift up and you would have obviously seen the gun. I can't say I'm not concerned with the constitutional rights of the neighbor, but it seems like a murder investigation takes priority over that. So, Wilson would have found the gun.

"I think the other thing that impresses me is that the clip was in very close proximity to where the gun was ultimately found, so had the gun not been found, had the defendant not shown the officers where the gun was, I could envision a blade by blade of grass search of this particular area by as many officers as it took to do it, and the discovery would have been made.

"So, in my judgment, I think it's appropriate under the circumstances to deny the motion to suppress, and I will do so."

Under the inevitable discovery doctrine, the prosecution may use evidence it obtained illegally but would have obtained legally in any event. *Nix v. Williams*, 467 U.S. 431, 444, 81 L. Ed. 2d 377, 104 S. Ct. 2501 (1984). The rationale is that punishment for an act that does no harm is not required in order to deter harmful acts. *United States v. Johnson*, 380 F.3d 1013, 1014 (7th Cir. 2004). Kansas courts apply the inevitable discovery exception to the exclusionary rule. See *State v. Ingram*, 279 Kan. 745, 750, 113 P.3d 228 (2005). In this case, the trial court ruled that the State could use evidence it obtained by violation of Ackward's Sixth Amendment right to counsel because the evidence inevitably would have been discovered anyway.

On appeal, Ackward does not argue with the district court's finding that the gun inevitably would have been discovered. He does, however, argue with the legal conclusion that the murder investigation trumps the neighbor's expectation of privacy in his or her property. Ackward contends that the inevitable discovery exception to the exclusionary rule applies only when the inevitable discovery would have been by legal means, illegal means would have been used in this case, and, hence, the exception does not apply. He points out that the police had neither a warrant nor consent to

search the house south of 1811 SW Lincoln. Nor did they have probable cause on which to base a warrant application.

The State does not argue that the inevitable discovery of the gun would have been by lawful means. Instead, the State responds that Ackward had no constitutional interest in the crawl space of the house adjacent to 1811 SW Lincoln and accordingly his rights were not violated by the search. Citing *State v. Johnson*, 253 Kan. 356, 371, 856 P.2d 134 (1993), the State argues defendant has no standing to challenge the legality of the search under the crawl space cover.

Defendant relies on *Johnson*, 380 F.3d 1013, where the 7th Circuit Court of Appeals held that inevitable discovery by illegal means did not render evidence admissible even if the defendant could not have directly challenged the legality of the means. Johnson and two other persons were sitting in his parked car when two police officers, without consent or grounds for arrest or a *Terry* stop, ordered them out of the car. One officer found drugs under Johnson's seat; the other officer found drugs and counterfeit money on the passengers. The officers then searched the trunk and found more counterfeit money and a color copier. Johnson argued that the evidence from the trunk could not be used against him because the police had no legal basis for seizing him and searching under his seat. The trial judge concluded that the illegal seizure of defendant and search under his seat were immaterial because, once the drugs and counterfeit money were found on the passengers, police had probable cause to search the entire vehicle and Johnson had no standing to challenge the legality of the search of the passengers.

The federal Court of Appeals reframed the issue:

"This would be correct if Johnson were trying to prevent the contraband seized from the passengers, as distinct from the trunk of [the] car, from being used against him. . . . But all he is trying to do is prevent the use of evidence seized from him—from the trunk of *his* car. And so the question is not his 'standing' to challenge the use against him of evidence seized illegally from other people—no such evidence, to repeat, was used against him. It is whether the fact that an illegal search of other people would have turned up the evidence illegally seized from him should allow the government to use that evidence against him." 380 F.3d at 1015.

For several reasons, the 7th Circuit court concluded that inevitable discovery by illegal means does not render illegally obtained evidence admissible. First, the court noted that an affirmative answer to the question it posed would have the paradoxical effect of two illegal searches making a legal one. 380 F.3d at 1015. Second, the court considered harm:

"[I]f police conduct an illegal search that does no harm because the same evidence would have been obtained lawfully, there is no need to punish them; but this assumes that the evidence would indeed have been obtained *lawfully*, for only then is there no harmful illegality. Consistent with this analysis, the canonical statements of the independent-source and inevitable-discovery doctrines uniformly refer to a 'lawful' independent source and to 'lawful' inevitable discovery. *Murray v. United States, supra*, 487 U.S. at 542; *Nix v. Williams*, 467 U.S. 431, 444, [81 L. Ed. 2d 377, 104 S. Ct. 2501] (1984)." 380 F.3d at 1016-17.

And then the court brought the discussion full circle to the government's standing argument:

"These cases are not in conflict with the cases cited earlier that bar a defendant from challenging evidence seized in violation of someone else's rights. See also *United States v. Payner*, 447 U.S. 727, [65 L. Ed. 2d 468, 100 S. Ct. 2439] (1980). The evidence challenged here *was* seized in violation of the defendant's rights— it was taken from underneath Johnson's seat and from the trunk. The government's argument is that the violation is cancelled by the fact that the evidence would have been discovered as a consequence of the illegal search of the passengers, to which he could not object. The fallacious character of the argument is demonstrated by the fact that if the passengers tried to exclude the evidence in their own cases, they would be met by the identical argument; the evidence would have been discovered in an illegal search (that of Johnson) to which they cannot object. In the ordinary case in which a defendant would like to get mileage from challenging the illegal search of a third party, that party, at least, can challenge the search. But the government's position is that because there were two illegal searches in this case no one can invoke the exclusionary rule against the use of the evidence obtained by the searches. In other words, the more illegal searches there are, the narrower is the scope of application of the exclusionary rule. We cannot see what sense that makes." 380 F.3d at 1017.

In *Johnson*, the 7th Circuit court noted that its decision created a conflict with another federal Court of Appeals, which had decided the only similar case to be found, *United States v. Scott*, 270 F.3d 30 (1st Cir. 2001). 380 F.3d 1017-18. Scott drove his co-defendant Stephens to an electronics store where Stephens tried

to pay for his purchase with a check and false identification. The check was not accepted, and Stephens left the store without taking his identification. The store manager saw that there was another man in the car Stephens got into, noted the tag number, and called police. When Stephens returned to reclaim his identification, two police officers were waiting for him. He turned and ran toward Scott's car but was stopped before reaching it and placed in the police cruiser. Officer Brogan approached Scott's car, which was the one seen earlier by the store manager, and asked if Scott knew Stephens. Scott denied knowing him. The officer concluded Scott was lying, advised Scott of his rights, and ordered him out of the car. The officer opened the glove compartment, found an illegal hypodermic needle, and arrested Scott. The officer returned to ask Stephens his age and address, which Stephens answered with information different from that on the identification he tried to use. Stephens was arrested for attempting to pass a bad check and for conspiring with Scott to do so. Some of the items Scott sought to have suppressed were obtained in an inventory search of Scott's car. The Court of Appeals concluded that the officer's opening the glove compartment was unreasonable. 270 F.3d at 42.

From there, the Court of Appeals analysis turned to the inevitable discovery exception, discussing several 1st Circuit cases and reviewing the reasoning of the district court's reliance on inevitable discovery to deny the motion to suppress.

The Court of Appeals then stated:

"We think this question is close. The application of the inevitable discovery exception to this case would allow the government to benefit at least somewhat from the unconstitutional actions of the Natick police—and if here there were two illegalities rather than one, that arguably strengthens rather than weakens the need for suppression as a means of deterrence. The history of the inevitable discovery exception, however, is instructive. The Supreme Court has described this exception as an 'extrapolation,' *Murray v. United States,* 487 U.S. 533, 539, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988), from the older principle of the independent source. This principle, discussed by Justice Holmes in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S. Ct. 182, 64 L. Ed. 319 (1920), is that although the government may first learn of certain facts by illegal means, it may nevertheless prove those facts at trial if it later learns of them by independent, legal means. *Id.* at 392, 40 S. Ct. 182 ('Of course this does not mean that . . . facts [illegally] obtained become sacred and inaccessible. If knowledge

of them is gained from an independent source they may be proved like any others . . . .').

" . . . The question in independent source cases is one of causation; suppression requires at least a finding that the challenged evidence would not have been obtained but for a constitutional violation as to the defendant in the case at issue. We conclude, because of the close link between the two doctrines, that the principle should be the same in the case of inevitable discovery: a means by which challenged evidence would inevitably have been discovered that itself violates the law is not, *by that violation alone,* unlawful as to a defendant if those means did not violate that defendant's personal rights.

. . . .

"We look at the incentives here. In this case, there were two unconstitutional acts, rather than one, and we think it appropriate to take Brogan's treatment of Stephens into account in assessing the facts as a whole with regard to Scott. On these facts, Brogan had little incentive to violate Stephens's *Miranda* rights (had he known he was doing so) in order to gain the advantage with Scott of use of the inevitable discovery doctrine. Brogan's incentive was to be able to use Stephens's statements against him. Application of the inevitable discovery doctrine would not, we think, act here as an incentive to unconstitutional behavior. Other cases may present different incentives and warrant a different outcome. We also take into account that neither constitutional violation was truly egregious, as was the excessive force used in *United States v. Rullo,* 748 F.Supp. 36 (D.Mass.1990). Moreover, although we have assumed the correctness of the district court's view that the police subjected Stephens to a de facto arrest, we think that point was itself close and that the police might have reasonably believed they had undertaken only a justified investigatory stop. We hold that on the facts of this case the doctrine of inevitable discovery applies and exclusion is not required to remove incentives for future police misconduct." 270 F.3d at 44-45.

Judge Posner, writing for the 7th Circuit Court of Appeals describes the 1st Circuit's analysis as "at once complex and spongy, as well as inconsistent with the logic of the independent-source/ inevitable-discovery doctrine." 380 F.3d at 1017. He continued:

"That doctrine (or if one prefers pair of Siamese twin doctrines) merely recognizes that if there is a lawful basis for the seizure of some evidence, the fact that the seizure was also based on illegal acts need not trigger punishment, because the acts did no harm (no harm so far as obtaining the evidence was concerned— there might be collateral damage, remediable by suits under 42 U.S.C. § 1983 or state tort law, to property or privacy interests of the defendant). There is a need for punishment when the only basis for the seizure of the evidence is a series of illegal acts. The assumption that the independent source must be 'lawful' is thus not merely an accidental dictum; it is part of the essential logic of the rule and of its origins in fundamental principles of tort law." 380 F.3d at 1017-18.

We find the reasoning of *Johnson* to be persuasive.

In the present case as in *Johnson*, the challenged evidence was seized in violation of the defendant's rights. In this case, the gun was seized in violation of Ackward's right to counsel. The State's argument, like the federal government's, is that the violation is cancelled by the fact that the evidence would have been discovered as a consequence of the illegal search, to which defendant could not object. In this case, the illegal search was of the crawl space of the house south of 1811 SW Lincoln, to which Ackward could not object. Hence, as in *Johnson*, the prosecution's position is that, because there were two illegal searches, Ackward cannot invoke the exclusionary rule against the use of the evidence so obtained. As we have seen, the *Johnson* court could see no sense in the government's position and held that the inevitable discovery of evidence by unlawful means did not render it admissible. We agree. The district court erred in admitting the gun into evidence.

Here, there was ample evidence of a handgun and its possession by Ackward. There was eyewitness testimony of Nathan Wells and Ackward's statement. Admitting the gun into evidence did not prejudice the defendant. Errors that do not affirmatively cause prejudice to the substantial rights of the defendant do not require reversal when substantial justice has been done. *State v. Kendall*, 274 Kan. 1003, 1010, 58 P.3d 660 (2002). The error was harmless, and reversal is not required.

We next consider the jury instruction on self-defense.

Ackward was charged with first-degree murder. The jury was instructed that, to establish the charge, the following claims must be proved:

"1. That the defendant killed Joshua D. Buckman;

"2. That such killing was done while in the commission of, attempt to commit, or flight from aggravated robbery and/or attempted possession with intent to sell marijuana; and

"3. That this act occurred on or about the 12th day of February, 2003, in Shawnee County, Kansas."

The jury received the following instruction on self-defense:

"The defendant has claimed his conduct was justified as self defense.

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself against such aggressor's imminent use of unlawful force. Such justification requires both a belief on the part of defendant and the existence of facts that would persuade a reasonable person to that belief."

K.S.A. 21-3214(1) provides that a forcible felon is not entitled to use force in self-defense. PIK Crim. 3d 54.20, which was Instruction No. 19 in the present case, is based on 21-3214(1):

"A person is not justified in using force in defense of himself if he is committing or attempting to commit aggravated robbery or possession with intent to sell marijuana, forcible felonies."

"Forcible felony" is statutorily defined as including "any treason, murder, voluntary manslaughter, rape, robbery, burglary, arson, kidnapping, aggravated battery, aggravated sodomy and any other felony which involves the use or threat of physical force or violence against any person." K.S.A. 2004 Supp. 21-3110(8).

At trial, defense counsel objected to Instruction No. 19 with respect to the attempted possession with intent to sell marijuana. Defense counsel argued that the offense was neither an inherently dangerous felony nor a forcible felony in the circumstances of this case. The jury found Ackward guilty of murder and attempted possession of marijuana with intent to sell. Thus, the jury was instructed that Ackward was not justified in using force in self-defense.

On appeal, defendant argues that the attempted possession of marijuana with intent to sell was not a forcible felony in the circumstances of this case. The circumstances defendant draws to the court's attention are that he and Buckman both wanted to buy marijuana from Triplett. As they neared Triplett's apartment, a dispute erupted between the defendant and Buckman. Buckman had a gun. Ackward took it from him, and, as Buckman fought him, the defendant shot Buckman. According to defendant, there was no evidence that either young man was immersed in the drug culture and the jury rejected robbery as the reason for the killing. Hence, according to Ackward, the shooting was unrelated to the violence that is always a possible adjunct of illegal drug transactions and instead was the upshot of a dispute between him and Buck-

man. On this ground, he would distinguish *State v. Jacques*, 270 Kan. 173, 177-81, 14 P.3d 409 (2000), and *State v. Mitchell*, 262 Kan. 687, 690-96, 942 P.2d 1 (1997), in which self-defense instructions were properly refused on the ground that sale of cocaine and possession of cocaine respectively were forcible felonies. He especially would distinguish the following language from *Jacques*:

"[T]here is an aura of violence surrounding the possession of illegal drugs. Those in possession of illegal drugs are often susceptible to being robbed or physically harmed by others wanting their drugs or money. Those in possession of illegal drugs are often a threat to others around them as well. Having possession of illegal drugs such as cocaine is often a deadly risk." 270 Kan. at 180.

The analysis applicable to a determination whether a collateral felony is a forcible felony within the meaning of K.S.A. 2004 Supp. 21-3110(8) was set out in *Mitchell*:

"In determining whether sale of cocaine is a forcible felony so as to prohibit the defense of self-defense in a felony-murder charge, consideration of the circumstances of the commission of the crime, in addition to the elements of the crime in the abstract, is appropriate because the legislature has determined a cocaine sale to be an inherently dangerous felony in K.S.A. 21-3436(14)." 262 Kan. 687, Syl. ¶ 1.

K.S.A. 2004 Supp. 21-3436(a)(14) provides that any felony offense as provided in K.S.A. 65-4160 through 65-4164 shall be deemed an inherently dangerous felony. K.S.A. 2004 Supp. 65-4163(a)(3) provides that possession of marijuana is a felony offense and, hence, an inherently dangerous felony.

The State contends that the abstract elements of possession of marijuana are comparable to those of possession of cocaine and that the circumstances surrounding the crime in this case are similar to the circumstances in *Jacques*, which convinced the court that the collateral felony of possession of cocaine was a forcible one. In the State's view, the evidence showed both Ackward and Oneal carrying guns, Ackward was attempting to possess marijuana in order to sell it to Buckman, and Ackward took money from Buckman after shooting him. Ackward maintains that both he and Buckman planned to buy marijuana from Triplett. Ackward told police Buckman was carrying the gun and defendant took it away from him during their dispute. Ackward denied taking money from

Buckman after shooting him, and the State's evidence showed that Buckman's wallet was in his pocket when police found him. Even in Ackward's version of events, two of the four people who went to the apartment complex for the purpose of obtaining marijuana were carrying guns and a dispute broke out between two of them that led to a gun being pulled out, fought over, and fired, not once but twice. Thus, even for the defendant's account, the above-quoted language from *Jacques* is as descriptive of circumstances in this case as it was of circumstances in the earlier case. The possession of or desire to possess illegal drugs often brews an atmosphere of violence with participants being susceptible to robbery and physical harm by others wanting their drugs or money.

In conclusion, we can paraphrase *Jacques*: The events of February 12, 2003, lent themselves to danger and the threat of violence. The circumstances involving the crime must be considered as well as the abstract elements of the crime. Our legislature has included the possession of marijuana as an inherently dangerous felony and although not all items found on the inherently dangerous felony list are included as forcible felonies, we hold that, under the specific facts of this case, possession of marijuana is a forcible felony as contemplated by K.S.A. 2004 Supp. 21-3110(8). As a result, the trial court did not err in instructing the jury on the felony-murder charge that a person is not justified in using force in defense of himself or herself if he or she is attempting to possess marijuana with intent to sell.

Ackward also asserts that the district court abused its discretion in admitting a photograph of the victim.

The trial court has broad discretion regarding the admission of photographs, including discretion to exclude photographs if their probative value is substantially outweighed by the risk of unfair prejudice. *State v. Cavaness*, 278 Kan. 469, 478, 101 P.3d 717 (2004). Ackward contends that the admission of a photograph of Buckman, which was taken before the night of his death, added nothing to development of the issues and was unduly prejudicial because it "was likely to generate an emotional response." Elsewhere, he refers to the "inevitable emotional reaction" to the pho-

tograph. The defendant, however, never states precisely what it is about the photograph that he expects to stir the jurors' emotions.

The State's position is that the photograph was relevant to establish the identity of the victim, an element the State must prove beyond a reasonable doubt. *State v. Hebert*, 277 Kan. 61, 103, 82 P.3d 470 (2004). The State asserts that Buckman's identity was established by Wells' identifying the photograph of his friend. Wells did not see the victim after the shooting, but his identification of the photograph of Buckman did link with that of the coroner to establish Buckman as the person on whom the autopsy was performed.

In *Hebert*, the court reviewed Kansas and foreign cases on the subject of admission of pre-death photographs. 277 Kan. at 100-03. Although other states' courts view the admission of pre-death photographs as error, this court concluded that it was not necessarily error. In *Hebert*, the court stated:

> "The photograph of Deputy Kenney in his uniform was relevant to prove identity and that he was a law enforcement officer, both of which were elements that the prosecution had to prove beyond a reasonable doubt. The photograph was displayed one time early in the trial and was not accompanied by inflammatory personal details about Deputy Kenney. Therefore, it was not error to admit the photograph into evidence." 277 Kan. at 103.

In the present case, the photograph was relevant to prove the shooting victim was Joshua Buckman, as charged in the complaint, which was an essential element of the State's proof. There was only one display of the photograph of Buckman, and Ackward does not complain that it was accompanied by inflammatory personal details about the victim. The court did not err in admitting the photograph into evidence.

We next consider if the district court abused its discretion in refusing to strike two prospective jurors for cause.

Because only the district court is in a position to view the demeanor of prospective jurors during voir dire, a district court's ruling on a challenge for cause will not be disturbed on appeal unless it is clearly erroneous or amounts to an abuse of discretion. *State v. Kleypas*, 272 Kan. 894, 991, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002).

Ackward contends that the trial court abused its discretion in denying his challenges for cause of prospective jurors R.M. and R.L. He contrasts the trial court's dismissing another prospective juror.

Prospective juror R.M. stated that, in 1995 or 1996 when she owned a liquor store, someone came in to rob her. Defense counsel moved to strike R.M. because she was the victim of an aggravated robbery, which was one of the charges in this case. Stating, "I think she would be okay," the trial court denied the challenge.

Prospective juror R.L. formerly worked as a Topeka police officer and feared that he might be perceived as having made up his mind before hearing all the evidence. He denied that his former work would affect his ability to sit as a fair and impartial juror, but he was quite concerned about the perception of partiality. He said, "Absolutely, yes," he would try to be fair, and, "I can be completely impartial." Defense counsel moved to strike R.L. because he was a former Topeka police officer, who knew several of the witnesses from working with them. The trial court denied the challenge.

Defendant contrasts the trial court's treatment of prospective juror J.M. with its denying the challenges for cause. Out of the hearing of the jury panel, J.M. told counsel and the trial court that her daughter was in prison in another state for attempted murder and that her daughter was not treated well by the court or attorneys. Prospective juror J.M. stated: "I don't think I could be really fair because of what I have gone through and I wouldn't be judgmental at all." Asked what was causing her concern, she said: "Certainly personal, but I think I can be fair, I mean, I just wanted you to know." Without prompting by counsel, the trial judge suggested that the prospective juror might be more comfortable on another case and released her back to the jury coordinator.

However, because defendant removed R.M. and R.L. with peremptory challenges, the question before the court is whether the jury that heard the case was impartial. *State v. Heath*, 264 Kan. 557, 587-88, 957 P.2d 449 (1998). Although a defendant may be forced to use a peremptory strike to get rid of a prospective juror, the mere loss of that peremptory strike does not constitute a violation of the constitutional right to an impartial jury. 264 Kan. at

588. "This is because peremptory challenges are means to achieve the end of an impartial jury, and so long as the jury that ultimately sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the Sixth Amendment was violated. [Citation omitted.]" 264 Kan. at 588. Ackward admits that he "cannot definitively say that the jury was not impartial."

Ackward finally asserts that cumulative errors deprived him of a fair trial.

Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. *State v. Holmes*, 278 Kan. 603, 641, 102 P.3d 406 (2004).

However, since we find error only in the admission of the gun into evidence, there is no cumulative error.

Affirmed.